1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

8

| | |
|---|---|
| ELIZABETH AITKEN, JOSHUA ALLAN FRANCIS, MICHELLE HINKLE, LEONARD VERVALEN, CRAIG MATTHEW ALLISON, SHAWNA BAKER, ANDREW COMENOUT-McMINDS, MISTY ALANA MICHEAU, REVEREND SARAH MONROE, and APRYL OBI BOLING,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF ABERDEEN, a municipal government,<br><br>Defendant. | NO.<br><br>COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND JURY DEMAND |

The Plaintiffs, by and through their attorneys of record, allege as follows.

## I.    PARTIES

1.    Elizabeth Aitken is a resident of River Camp in Aberdeen, Washington.

2.    Joshua Allan Francis is a resident of River Camp in Aberdeen, Washington.

3.    Michelle Hinkle is a resident of River Camp in Aberdeen, Washington.

4.    Leonard Vervalen is a resident of River Camp in Aberdeen, Washington.

5.    Craig Matthew Allison is a resident of River Camp in Aberdeen, Washington

6.    Misty Alana Micheau is a resident of River Camp in Aberdeen, Washington.

7.    Shawna Baker is a resident of River Camp in Aberdeen, Washington.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND JURY DEMAND – I

DOE002-0001 5759164

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

8.     Andrew Comenout-McMinds is a resident of River Camp in Aberdeen, Washington.

9.     The Reverend Sarah Monroe is a resident of Grays Harbor, Washington and a pastor ordained by the Episcopal Church.

10.    Apryl Obi Boling is a resident of Aberdeen, Washington.

## II.     JURISDICTION AND VENUE

11.    This Court has jurisdiction over the subject matter of this suit pursuant to 28 U.S.C. § 1343 (3), 42 U.S.C. §1983, and 28 U.S.C. §1367.

12.    This claim arose in the Western District of Washington.  On information and belief all parties reside in the Western District of Washington.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## III.     OPERATIVE FACTS

### Background

13.    In Aberdeen, Washington, homeless people have been camping and living on a strip of land located on the banks of the Chehalis River for over a century.

14.    For decades this land where homeless people camp was known as Hobo Beach.

15.    Native American peoples have been fishing in the Chehalis River from this land for centuries.

16.    Article III of the Quinault Treaty of 1856, between the Governor of the Washington Territory and the Quinault Tribe, expressly recognized and "secured" the "right to fish at all accustomed grounds and stations" and further recognized the right of erecting temporary houses while conducting such fishing operations.  The land where the plaintiffs are now living is one of those accustomed fishing grounds and stations.

17.    For the past few years this land has been known as "River Camp" and the homeless people living there generally refer to it by that name.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
AND JURY DEMAND – 2

DOE002-0001 5759164

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

18.     Homeless people have been living at River Camp continuously for at least the past two decades.  On a few occasions when police have cleared everyone off the property, River Camp has been unoccupied for a very brief period of time such as a few days, but the inhabitants have always come back quickly.

19.     Some of the homeless people who presently live at River Camp live in shelters that they have built themselves.  Others live in shelters that were built by other homeless people before them.

20.     Many of the homeless people who presently live at River Camp live in tents.

21.     On occasion, strong winds have destroyed, damaged, or blown away their tents and shelters.  This happened recently in December of 2018 when a number of residents lost their tents.  On that occasion, other residents took these shelterless people into their tents and shelters until they were able to get replacement tents.

22.     The Mayor of Aberdeen, Aberdeen City Council members, and many other people, often refer to these homeless people as "campers."

23.     To the extent that this word conjures up an image of recreational campers who are enjoying the outdoors by living in tents or sleeping under the stars, this word is misleading.

24.     This word is also misleading to the extent that it implies that the people living there are only there for very brief periods of time.

25.     For example, plaintiffs Hinkle and Vervalen have been living at River Camp for more than eight years.

26.     In this Complaint, the homeless people living on this land are referred to as "residents" of River Camp.

27.     A number of railroad tracks traverse River Camp.

28.     At present there are two ways that a person can enter River Camp on foot without crossing the railroad tracks.  These two "entrances" are "gated" in the sense that the City has

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
AND JURY DEMAND – 3

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOE002-0001 5759164

1    erected a crossing guard rail that prevents vehicles from entering River Camp, but a pedestrian

2    can enter at these two places without having to cross the tracks.

3        29.    Railroad cars are parked on the railroad tracks at all times.  Occasionally,

4    moving railroad cars travel on the rails.  When they do move, they generally move quite slowly

5    at speeds of roughly 5 to 10 mph.

6        30.    On information and belief, in the fall of 2018 when the City of Aberdeen

7    announced that homeless people needed a permit to live on the River Camp land, approximately

8    100 homeless people were living there.

9        31.    Heron Street and State Street are parallel to the River Camp property.  Due in

10   part to buildings along these streets, and also due to the parked railroad cars, River Camp is

11   largely invisible to anyone who does not deliberately enter the property at one of the two gated

12   entrances and walk in to the camp.  The homeless residents of River Camp are therefore

13   virtually invisible to the world.  Except for occasional far off glimpses, people traveling on the

14   nearest streets, cannot see them or their tents and shelters.

15   **City purchase of River Camp property from private owners**

16       32.    From 2008 until August of 2018, the River Camp property was privately owned

17   by Michael and Tessie Lang.

18       33.    In May of 2018, the Aberdeen City Council authorized Mayor Erik Larson to

19   negotiate the purchase of the River Camp property from the Langs.

20       34.    In August of 2018, the City purchased the Riverfront Camp property for

21   $295,000.

22       35.    On July 14, 2018, the Mayor of Aberdeen was quoted in a Daily World news

23   article as referring to the River Camp property and saying this: "The reality is, that is not a

24   viable place for people to inhabit," Larson said at this week's [City Council] meeting.  "It's a

25   dangerous space and they [the homeless living on the property] cannot remain there."

26

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF      **CARNEY BADLEY SPELLMAN, P.S.**
AND JURY DEMAND – 4                                  701 Fifth Avenue, Suite 3600
                                                     Seattle, WA 98104-7010
DOE002-0001 5759164                                  (206) 622-8020

36.     The City's motivating purpose for purchasing the River Camp property was to be able to evict the homeless people living there from the property.  Thus, the intention of the City was to remove the Plaintiffs and all others residing on the River Camp property from the land.

**Permit requirements promulgated**

37.     On September 15, 2018, the Office of the Mayor of Aberdeen issued a statement which announced that no one could enter the River Camp property without the written permission of the City, and that anyone who entered without such written permission would be trespassing.

38.     In late September and/or early October, the City handed out notices in and near River Camp which contained a warning that all "Campers" living on the property had to register with the City by no later than October 15, 2018.

39.     On September 25, 2018, Mayor Erik Larson and Tawni Andrews, the President of the Aberdeen City Council, visited River Camp in the afternoon.

40.     On the same day, Aberdeen city police officers including Police Chief Steven Shumate, visited River Camp and contacted the homeless people living there.

41.     On that date, the police told the residents of River Camp that they would be allowed to stay on the property as long as they were accessing social services.

42.     On that date, when plaintiff Monroe asked Police Chief Shumate how long they could stay there, Shumate told Monroe that he didn't know but that he did not want to move people out during the winter.

43.     Some of the residents left River Camp because they did not want to provide the City with the "registration" information that the City was demanding.

44.     Aberdeen police officers went "tent-to-tent" gathering residents' names and dates of birth.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
AND JURY DEMAND – 5

DOE002-0001 5759164

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

1    45.    Those residents who provided the information requested were "registered" and

2    were given permits to live on the property.

3    46.    The City has said that those permits are valid until May 1, 2019.

4    47.    According to the City, in mid-October it had issued 108 residency permits to

5    people living at River Camp.

6    **Anti-camping ordinance and recently adopted amendments to the ordinance**

7    48.    The City of Aberdeen has an anti-camping ordinance.  Ordinance No. 6522, first

8    enacted in October of 2011, has several sections:  AMC §12.46.010 (Findings); §12.46.020

9    (Purpose); §12.46.030 (Definitions); §12.46.040 Unlawful Camping and storage of personal

10   property in public places); §12.46.050 (Penalty for Violations); and §12.46.060 (Public duty

11   Created).  The original text of these ordinances is attached as Appendix A.

12   49.    As originally enacted, any violation of AMC §12.46.040 was punishable as a

13   misdemeanor criminal offense pursuant to AMC §12.46.050.

14   50.    As originally enacted, §12.46.040(A) made it "unlawful for any person to camp

15   or use camp paraphernalia" in (1) public parks; (2) Public streets, sidewalks and public rights

16   of way; and (3) public parking lots "or other publicly owned or maintained areas."

17   51.    On September 14, 2018, the United States Court of Appeals issued a decision in

18   *Martin v. Boise,* 902 F.3d 1031 (9th Cir. 2018).  In *Martin* the Court held that as applied to

19   homeless persons who had no other place to live, it violates the Cruel and Unusual Punishment

20   Clause of the Eighth Amendment to make it a criminal offense to sleep or live in a public place.

21   52.    After *Martin* was decided, in February of 2019 the Aberdeen City Council

22   substantially amended its anti-camping ordinance (Aberdeen Municipal Code §§12.46.010 *et*

23   *seq.*) in a number of ways.

24   53.    The 2019 amendments law broadened the scope of the prohibition against

25   camping, making it applicable, inter alia, to *any* publicly owned property. *See* new

26   §12.46.040(A)(5).  (Attached as Appendix B)

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF        **CARNEY BADLEY SPELLMAN, P.S.**
AND JURY DEMAND – 6                                                        701 Fifth Avenue, Suite 3600
                                                                                          Seattle, WA 98104-7010
DOE002-0001 5759164                                                            (206) 622-8020

54.    The 2019 amendments made enforcement of the law against camping mandatory at almost all times, except for one provision that purports to identify one subsection of the law that is not to be enforced "on the date" when camping is to take place if there is a determination made by some unknown person that there is not adequate shelter for homeless people on that date.

55.    The 2019 amendment changed the classification of unlawful camping from a misdemeanor criminal offense to a civil infraction.

56.    Aberdeen has a Street and Sidewalk Obstruction law.  Enacted in 2006, AMC §12.44.040 makes it a crime to place anything "in any street or on any sidewalk of the city, so as to obstruct the free use and passage thereof without first obtaining a permit from the city." This law makes it unlawful for any homeless person to erect a tent or shelter in any street or on any sidewalk.

57.    AMC §12.44.060 charges the street commissioner with the special duty of seeing to it that this law is "strictly enforced" and requires him or her "to cause the arrest of any person violating the same."  AMC §12.44.050 provides that any person who is fined for violating the street and sidewalk ordinance who fails to pay such fine and the costs of prosecution shall be jailed until they are paid for a period of time not to exceed thirty days.

**Inadequate shelter facilities for homeless persons in Aberdeen**

58.    There are inadequate shelter facilities for the homeless within the City of Aberdeen.  At present there are two shelters: Union Gospel Mission and a women's shelter called Friendship House.  Grays Harbor County says they both will take up to 40 people.  The women's shelter will not take women with male children over eight years old.  Neither shelter will shelter couples.  Both shelters have religious requirements.

59.    The Grays Harbor County Public Health Department estimates that up to 3,000 people are homeless in Grays Harbor at any given time, with 500 to 700 people literally on the street every day.  In December of 2017, the Department of Social and Health Services estimated

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND JURY DEMAND – 7

DOE002-0001 5759164

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

1  that Aberdeen had 1,050 homeless people, with 512 people who were "Homeless without

2  Housing" (defined as persons "who lack a fixed, regular, and adequate nighttime residence and

3  do not have a place to stay at the time of report) and 515 people who were "Homeless with

4  Housing" (defined as people "commonly referred to as 'couch surfing', which means they do

5  not have a fixed, regular, nighttime residence, but they do have a place to stay at the time of

6  report). (See attached Appendix C: "DSHS DATA"). Thus best estimates are that as of

7  December of 2017 the supply of shelter for the homeless in Aberdeen was grossly inadequate,

8  with 80 beds for roughly 500 unsheltered people.

9  **Imminent enactment of ordinance prohibiting all public access to River Camp**

10  60.  On Wednesday, April 10, 2019, the Aberdeen City Council passed a first reading

11  of proposed Aberdeen City Ordinance No. 19-5. (Attached as Appendix D). This proposed

12  ordinance, if passed, would prohibit anyone from being on the River Camp property.

13  61.  Following a recitation of several "CONCERNS," Section 2 of Ordinance No.

14  19-5 states the following "Finding": "In consideration of the above the City Council finds the

15  River Street property in its current condition to be unfit for human habitation or open public

16  access."

17  62.  Section 3 of Ordinance No. 19-5, entitled "Exercise of Police Powers in Light

18  of Life Safety, Public Safety, and Public Welfare Concerns," provides as follows:

19      1.  It is the purpose of this Ordinance to prevent harm to the health
20         or safety of the public and to promote the public health, safety
          and general welfare of all residents of the City of Aberdeen.

21      2.  Therefore, in exercise of its police powers, and consistent with
22         Resolution #2019-02 and Ordinance 6641, and *recognizing that*
          *any license for individuals to remain on the River Street*
23         *property expire on May 1, 2019 and will not be extended, the*
          *City Council of the City of Aberdeen prohibits all public access*
24         *to the River Street property as of the effective date of this*
          *Ordinance.*

25  (Emphasis added).
26

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

63.     The proposed ordinance states, in Section 6: "The ordinance shall take effect *immediately* upon its passage, signing and publication." (Emphasis added).

64.     On information and belief, the City Council intends to consider this ordinance again at its regularly scheduled meeting of April 24, 2019.

65.     On information and belief, therefore, Plaintiffs believe that the defendant City of Aberdeen intends to give final approval and adoption to this ordinance within the next fifteen days, and to implement on May 2 or shortly thereafter.

66.     There was only one day's advance notice that this proposed ordinance was to be considered at the City Council Meeting.  The original Agenda for the April 10, 2019 city council meeting did not mention this proposed ordinance.  Notice for publication in the newspaper was apparently given to the newspaper, the Daily World, either on April 9 or April 10.

67.     The City Council heard public comment on proposed Ordinance No. 19-5 on the evening of April 10.

68.     The proposed ordinance was debated and the Council members voted 12 to 1, with one member abstaining, to adopt it.

69.     A second reading of the ordinance is scheduled for Aril 24, 2019.

70.     It is estimated that at present there are 100 homeless people living at River Camp.  If they are driven out, it will be impossible for more than 1 or 2 of them – at the most – to find a place in one of the two existing shelters.  The rest will be shelterless.

### *Monroe v. City of Aberdeen Litigation*

71.     On November 19, 2018, three individuals filed suit against the City of Aberdeen and city officials to challenge the lawfulness of the permit program promulgated by Mayor Larson.  *See Monroe v. City of Aberdeen,* United States District Court Cause No. 18-CV-5949 RBL (W.D.Wa.) ("*Monroe*").  At the same time, these individuals filed a motion for a temporary restraining order, arguing that the permitting program violated their First Amendment rights of freedom of speech and freedom of religious exercise.

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

72.    United State District Court Judge Ronald Leighton held a hearing on December 12, 2018. At the close of that hearing, Judge Leighton directed the parties to attempt to resolve as much of the case as possible.

73.    The parties conferred and the City agreed to entry of an order prohibiting the City from maintaining a permit system. The parties also agreed to entry of an order that placed some reasonable time, place and manner restrictions pertaining to the River Camp property. On December 28, 2018 the Court adopted the parties proposed order. A copy of that order is attached to this Complaint as Appendix C.

74.    Thereafter, on January 24, 2019, the City served an Offer of Judgment and on February 1, 2019, the individual plaintiffs accepted that offer. The Court entered judgment on February 6, 2019. That judgment permanently enjoined the City from maintaining any kind of permit requirement for visiting residents of River Camp and awarded judgment against the City in favor of each individual plaintiff. The judgment also incorporated the time, place and manner restrictions previously imposed by the court's order (Appendix E) of December 28, 2018.

75.    On information and belief, the City does not claim that any Plaintiff in this action has violated any of the time, place, and manner restrictions that were adopted by this Court in the earlier *Monroe* litigation. Nevertheless, the City is in the process of enacting legislation that will prohibit the resident Plaintiffs from continuing to live at River Camp and will effectively banish each homeless Plaintiff from the City of Aberdeen.

**Plaintiffs**

76.    Plaintiff Aitken first began living at River Camp in the fall of 2018. She left and lived in Ocean Shores for a few months and returned to River Camp in November of 2018 and has been living there ever since.

77.    Aitken grew up in Shelton, Washington and attended Olympic College. She has been diagnosed with post-traumatic stress disorder that was brought on by her having witnessed

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
AND JURY DEMAND – 10

DOE002-0001 5759164

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

too much death. Her mother was murdered in 1995. Her boyfriend died in a fire when his house burned down in 2005. Her brother died suddenly in a mudslide in 2007.

78.     If Aitken is forced to leave River Camp she will have no place to live.

79.     Plaintiff Francis has been living at River Camp for the past five years. Francis is part La Push and is in the process of applying to be an enrolled member of the La Push Tribe. He has been fishing in the Chehalis River from River Camp since he was 16 years old.

80.     Due to a horrific car accident in 2008 in which he nearly died, Francis has permanent neurological injuries and experiences seizures. Since then he is no longer employable because he could experience a seizure at any moment. He makes a living salvaging wood from the Chehalis River and as an artist. He came to live at River Camp after he was released from the hospital where he was treated for the injuries he sustained in the car accident.

81.     If Francis is forced to leave River Camp he will have no place to live.

82.     Plaintiff Hinkle has been living at River Camp since 2011. She lives there with Plaintiff Vervalen. Hinkle moved to the Hoquiam area when she 20 years old and lived there for 20 years before moving to River Camp with Vervalen.

83.     Plaintiff Vervalen has been living at River Camp with Plaintiff Hinkle since 2011. Vervalen is 53 years old.

84.     Because they are a couple, no homeless shelter in Grays Harbor County will accept them because there is no shelter in Grays Harbor County that will accept men and women living together. Because they wish to continue to live together, even if they could find separate men's and women's homeless shelters that would accept them separately, they would not live there because they want to live together.

85.     Plaintiffs Hinkle and Vervalen have no employment, no regular income and no savings.

86.     If Hinkle and Vervalen are forced to leave River Camp they will have no place to live.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
AND JURY DEMAND – 11

DOE002-0001 5759164

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

87.    Plaintiff Allison has lived in the Aberdeen/Hoquiam area of Washington State for roughly 34 of his 38 years of life.  He attended elementary school, junior high school and high school in Aberdeen and Hoquiam, and graduated from Hoquiam High School in 1999.

88.    The last time Allison had a conventional home was four years ago.  At that time he was living in an apartment in Aberdeen.

89.    For the past 1-1/2 years Allison has been living at River Camp.  Until about two months ago he was living in a shelter that he built himself.  However, someone apparently set fire to it and it burned and was badly damaged.  Allison recently rebuilt it.

90.    Allison's ancestors came and settled in Grays Harbor County roughly a century ago.  Clifford Howard, Allison's great-uncle lived on the River Camp property where Allison lives now.  Howard purchased a house that was located on the River Camp property and his great-uncle lived there for many years.  Allison believes his great-uncle lived there until sometime in the 1950's.

91.    Allison is worried that if the City forces him off of River Camp that the City will also destroy the shelter that he has built and rebuilt, and that he currently lives in.  He wants to continue to live in his shelter.  If forced to leave he will have no place to go.

92.    Plaintiff Baker is 34 years old.  She has lived at River Camp with Leon T. Butler since June of 2014.  She last lived in a conventional home in 2014 when she was evicted for nonpayment of rent.

93.    Baker suffers from epilepsy.  Her seizures are aggravated and get worse when she is exposed to cold weather.

94.    Baker wishes to continue to live at River Camp.  If forced to leave she will have no place to go.

95.    Andrew Comenout-McMinds is 39 years old.  He has lived in Grays Harbor County since he was five years old.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
AND JURY DEMAND – 12

DOE002-0001 5759164

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

96.    Comenout-McMinds is an enrolled member of the Quinault Tribe. His enrollment number is 1766.

97.    Comenout-McMinds has lived at River Camp four different times. The first time was in 2004. The last time he lived at River Camp began in the fall of 2017 and he has been living there continuously since then.

98.    When Comenout-McMinds was 18 to 21 years old he used to go fishing with his uncle on the Wishkah and Chehalis Rivers.

99.    When he was 14 years old Comenout-McMinds was a passenger in a severe car accident. He survived but he lost the use of his arm. Eventually, due to abscesses, he had to have his arm amputated. He also shattered his femur in the accident.

100.    Comenout-McMinds has been diagnosed with bipolar disorder, PTSD, and depression. Doctors have refused to prescribe him the medicines he needs for those disorders because he has a drug addiction.

101.    Comenout-McMinds wishes to continue to live at River Camp. If forced to leave he will have no place to go.

102.    Plaintiff Micheau is 43 years old. She first began living at River Camp in 2011 and has been living there off and on since then. She last lived in a conventional home when she lived at the Harvard Apartments but when those apartments closed down she moved back to River Camp. She has never been unable to find a shelter bed in Aberdeen because there are no homeless shelters for women in Aberdeen.

103.    Michaeu wishes to continue to live at River Camp. If forced to leave she will have no place to go.

104.    Plaintiff Reverend Sarah Monroe is an ordained priest in the Episcopal Church and serves in the Episcopal Diocese of Olympia. She lives in Grays Harbor County.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
AND JURY DEMAND – 13

DOE002-0001 5759164

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

105.    Reverend Monroe grew up in Grays Harbor and lived in the county from ages 12-22, ages 26-27, and moved back to Grays Harbor in 2013. Ever since 2013 she has lived and worked there, there have been homeless people living at River Camp.

106.    Reverend Monroe is based in *Chaplains on the Harbor* located at 281 W. Spokane Street in Westport, Washington. *Chaplains* operates a ministry for the people of Grays Harbor County.

107.    *Chaplains* is a ministry of presence in Grays Harbor County, Washington, a developing worshiping congregation, and a faith-based center for rural leadership development in the movement to end poverty. *Chaplains* seeks to affirm the dignity and worth of people living in Grays Harbor and to seek a better life for a community struggling with deep poverty.

108.    *Chaplains* supports the poor people of Grays Harbor County by leading feeding programs and organizing for human rights and dignity in a county where nearly 50% of the population is poor.

109.    In Aberdeen, on Sunday afternoons *Chaplains* uses St. Andrews Episcopal Church as a host site and there serves food and coffee.  In 2018 *Chaplains* launched Harbor Roots, a program designed to hire young people trying to get off the street and to support them in recovery.

110.    There is an exceptionally large homeless population in Aberdeen, Washington. Many members of the Aberdeen community live in tents and makeshift shelters in River Camp.

111.    Reverend Monroe goes onto the River Camp property regularly to provide pastoral services to homeless people who live there.  She has been doing this for approximately five years. Many of the residents of River Camp are her friends. Many have invited her to visit them and they have invited her to worship or pray with them.  She has given people last rites. She checks on people who are most vulnerable.  She responds in crisis when requested.  She takes people to medical appointments, assists people in signing up for services, and offers general support and pastoral care to the homeless people living there.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
AND JURY DEMAND – 14

DOE002-0001 5759164

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

112.    Several homeless people to whom Reverend Monroe has provided pastoral services have died in the past five years.  Their names are tattooed on her arm.  Plaintiff Monroe fears that if evicted from River Camp, more members of her congregation will die, either from drug overdoses, exposure to cold weather, or from lack of ability to obtain medical treatment that she helps them secure.

113.    Apryl Obi Boling is a member of the Quileute Tribe.

114.    Boling was homeless for a period of time when she was a teenager.  During that period of time she lived on the streets of Seattle.

115.    Boling moved to Aberdeen, Washington in 1989 and has lived in Aberdeen ever since.

116.    Boling has relatives who are members of the Quinault and Quileute Tribes.

117.    Boling's cousin Leon Obi has been living at River Camp for approximately five years.  Boling's nephew Rowley Mason has been living there approximately one and a half years.

118.    Boling regularly visits her cousin Leon at River Camp several times a week.  She also visits her nephew Rowley Mason somewhat less frequently.

119.    There are roughly 30 Native Americans living at River Camp and Boling is related to about 15 of them. She visits those other relatives as well.

120.    Plaintiff Shawna Baker lives with Leon Obi.  Baker has epilepsy and suffers seizures.  Baker's condition is worse when she is cold.  By making fires with the firewood that Boling brings, Boling helps to keep Shawna warm and thus alleviates her condition.

121.    If they are evicted from River Camp, the homeless people living there will have no place where they can lawfully live in Aberdeen.  They cannot erect their tents and shelters on land owned by private persons without committing the crime of trespassing.  With the recently enacted amendments to the Aberdeen Municipal Code, they cannot lawfully live on any other publicly-owned land either.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
AND JURY DEMAND – 15

DOE002-0001 5759164

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

122.   If forced off of the River Camp property, the Plaintiffs and their homeless brothers and sisters living there with them, will have one of two choices:  They can violate the law, or they can leave the City of Aberdeen.  Plaintiff Monroe fears that many members of her homeless people congregation will choose the latter, and will simply leave Aberdeen for a nearby city such as Westport, Montesano, or Olympia.

123.   The City's recent amendments to its anti-camping law, and its threatened eviction of the homeless presently living at River Camp, thus threaten to deprive Reverend Monroe of her congregation.  By attempting to drive the homeless out of Aberdeen, the defendant City is seeking to make it impossible for Reverend Monroe to minister to them.

124.   If forced off of the River Camp property, Plaintiff Boling's relatives will have one of two choices:  They can violate the law, or they can leave the City of Aberdeen.  Plaintiff Boling fears that many members of her homeless relatives will be forced to choose the latter, and thus they will simply leave Aberdeen for a nearby city such as Westport, Montesano, or Olympia.  If her relatives are forced to migrate out of Aberdeen, it will be much harder for Boling to visit them and to assist them by bringing them food, clothes and firewood.  If this happens, Boling will see her relatives far less frequently and depending on where they move to, she may be unable to see them at all.  Thus, the threatened eviction of the homeless people living at River Camp threatens to prevent Boling from associating with her friends and relatives.

## IV.   CAUSES OF ACTION

**Deprivation of federal constitutional right to freedom of travel**

125.   By adopting laws, policies and customs that make it unlawful for the homeless Plaintiffs to live on any public property anywhere within the City of Aberdeen, the Defendant is threatening to deprive the Plaintiffs living at River Camp of their right to freedom of travel guaranteed by the United States Constitution by trying to drive them out of the City.  Plaintiffs' federal constitutional right *not* to relocate to another city or state is in imminent danger.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
AND JURY DEMAND – 16

DOE002-0001 5759164

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

**Deprivation of the Washington State Constitutional Right to Intrastate Freedom of Travel**

126.    By adopting laws, policies and customs that make it unlawful for the homeless Plaintiffs to live on any public property anywhere within the City of Aberdeen, the Defendant City is threatening to deprive the Plaintiffs living at River Camp of their right to freedom of travel guaranteed by the Washington Constitution by trying to drive them out of the City. Plaintiffs' state constitutional right *not* to relocate to another city or state is in imminent danger.

**Deprivation of Rights Guaranteed by the Eighth Amendment**

127.    The Defendant City of Aberdeen, acting under color of state law, by adopting laws, policies and customs, is threatening to deprived Plaintiffs of their Eighth Amendment rights to be free from cruel and unusual punishments and from excessive fines, contrary to 42 U.S.C. §1983, by making it impossible for them to live lawfully within the City of Aberdeen.

**Deprivation of Rights Guaranteed by Washington Constitution, article I, §14.**

128.    By making it impossible for them to live lawfully within the City of Aberdeen, by adopting laws, policies and customs, the Defendant City is threatening to deprive Plaintiffs of their state constitutional right to be free from cruel punishments and from excessive fines, contrary to Washington Constitution, article I, §14.

**Deprivation of Reverend Monroe's First Amendment rights**

129.    Defendant City of Aberdeen, acting under color of state law, is threatening to deprive Plaintiff Monroe of her First Amendment right of freedom of religious exercise, by impeding and preventing her from providing pastoral services to the homeless people currently living on the River Camp property.

**Deprivation of Plaintiff Boling's First Amendment right of freedom of association**

130.    Defendant City of Aberdeen, acting under color of state law, is threatening to deprive Plaintiff Boling of her First Amendment right of freedom of association, by causing her relatives currently living at River Camp to move out of Aberdeen, thereby impeding and/or preventing Boling from associating with her relatives.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
AND JURY DEMAND – 17

DOE002-0001 5759164

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

**Deprivation of Plaintiff Boling's art. 1, §4 state constitutional right of freedom of association**

131.    Defendant City of Aberdeen is threatening to deprive Plaintiff Boling of her state constitutional right of association, by causing her relatives currently living at River Camp to move out of Aberdeen, thereby impeding and/or preventing Boling from associating with her relatives.

132.    The imminent threat of eviction from River Camp has forced Plaintiffs to initiate this lawsuit very quickly and they have not had sufficient time to conduct all of the legal and factual research that they would like to have done.  For example, Plaintiffs believe that there is a sound legal basis to bring additional claims for violation of the Treaty rights of members of the Quinault, Quileute, Chehalis, or other Tribes.  Accordingly, Plaintiffs reserve the right to amend this complaint to add additional claims when the necessary factual and legal research has been completed.

## V.    CONDITIONAL JURY DEMAND

133.    In the event that the Defendant City's threatened action of evicting the homeless residents of River Camp from that property is successful and is not prevented, Plaintiffs assert that they will be entitled to compensatory and punitive damages of the violation of the rights enumerated above.  In the event that some or all of the Plaintiffs' claims become claims for damages, they demand a jury trial on those claims.

## VI.    REQUEST FOR CERTIFICATION OF STATE LAW QUESTIONS TO THE WASHINGTON SUPREME COURT

134.    Because this case includes state law claims asserted here along with federal claims, and because many of those state claims involve questions of first impression, Plaintiffs seek certification of one or more of those questions to the Washington Supreme Court.    In particular, Plaintiffs seek certification of these questions:

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

(1) Whether eviction of the homeless plaintiffs from River Camp would violate article 1, section 14 of the Washington Constitution?

(2) Whether making it unlawful for Plaintiffs to live on public property when they have no other place to live would violate article 1, section 14 of the Washington Constitution?

(3) Whether making it unlawful for Plaintiff Boling's relatives to live on public property in Aberdeen would deprive Plaintiff Boling of her article 1, section 4 of the Washington Constitution?

## VII.    PRAYER FOR RELIEF

Wherefore, having stated their complaint against the defendant, plaintiffs pray for the following relief:

1.      Injunctive relief prohibiting the defendant City from evicting the homeless Plaintiffs from River Camp unless and until such time as alternate shelter is made available for their use.

2.      Injunctive relief prohibiting the defendant City from making it unlawful for the homeless plaintiffs to "camp" or to live upon any public property within the City of Aberdeen unless and until such time as alternate shelter is made available for their use.

3.      Declaratory relief, declaring Ordinance 19-5, AMC §12.46.040 and .050, and AMC §12.44.040, and .050 and .060, unconstitutional as applied to the homeless.

4.      In the event that eviction is not enjoined, and it transpires, judgment against defendant for compensatory damages in an amount to be proved at trial.

5.      In the event that eviction is not enjoined, and it transpires, judgment against defendant for punitive damages, in an amount to be proved at trial.

6.      An award of costs and attorneys' fees, as provided in 42 U.S.C. § 1988, and other provisions of statutory and common law;

1    7.    An award of attorneys' fees under state law for successful preservation of a

2  common fund, or in this case, to wit: preservation of a common right to live on the land at River

3  Camp until alternate shelter is available.

4    8.    For such other relief as the Court may deem just.

5  DATED this 22nd day of April, 2019.

_s/ James E. Lobsenz_
James E. Lobsenz WSBA #8787
Attorneys for Plaintiffs
CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104
Phone:  (206) 622-8020

_s/ Todd Maybrown_
Todd Maybrown WSBA #18557
Attorneys for Plaintiffs
ALLEN HANSEN MAYBROWN &
OFFENBECHER
600 University Street Suite 3020
Seattle, WA 98101
Phone:  (206) 447-9681

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND JURY DEMAND – 20

DOE002-0001 5759164

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

# APPENDIX A

# Chapter 12.46
# PUBLIC CAMPING

Sections:

| | |
|---|---|
| 12.46.010 | Findings. |
| 12.46.020 | Purpose. |
| 12.46.030 | Definitions. |
| 12.46.040 | Unlawful camping and storage of personal property in public places. |
| 12.46.050 | Penalty for violations. |
| 12.46.060 | Public duty created. |

## 12.46.010    Findings.

People camping on public property and on public right of ways create a public health and safety hazard because of the lack of proper electrical and/or sanitary facilities for these people. People without proper sanitary facilities have openly urinated, defecated, and littered on public property on the public right of ways. Use of public property for camping purposes or storage of personal property interferes with the rights of others to use the areas for which they were intended.

(Ord. 6522, Added, 10/26/2011)

## 12.46.020    Purpose.

It is the purpose of this ordinance to prevent harm to the health or safety of the public and to promote the public health, safety and general welfare by making public streets and other areas readily accessible to the public and to prevent use of public property for camping purposes or storage of personal property which interferes with the rights of others to use the areas for which they were intended.

(Ord. 6522, Added, 10/26/2011)

## 12.46.030    Definitions.

The following definitions are applicable in this chapter unless the context otherwise requires:

A.   "Camp" or "camping" means to pitch, create, use, or occupy camp facilities for the purposes of habitation, as evidenced by the use of camp paraphernalia.

B.   "Camp facilities" include, but are not limited to, tents, huts, temporary shelters, or vehicles.

C.   "Camp paraphernalia" includes, but is not limited to, tarpaulins, cots, beds, sleeping bags, blankets, mattresses, hammocks, or non-city designated cooking facilities and similar equipment.

D.   "Store" means to put aside or accumulate for use when needed, to put for safekeeping, to place or leave in a location.

E.   "Vehicle" means the same as defined in RCW 46.04.670 and vehicle "parking" means the same as defined in RCW 46.04.381, as adopted by AMC 10.04.010.

(Ord. 6522, Added, 10/26/2011)

## 12.46.040     Unlawful camping and storage of personal property in public places.

A.   It shall be unlawful for any person to camp or use camp paraphernalia in the following areas, except as otherwise provided by ordinance:

   1.   Public parks, except as authorized under Chapter 2.60 AMC;

   2.   Public streets, sidewalks, or other improved or unimproved public rights-of-way;

   3.   Publicly owned or maintained parking lots or other publicly owned or maintained areas, improved or unimproved.

B.   It shall be unlawful for any person to occupy a vehicle for the purpose of camping while that vehicle is parked in any of the areas listed in AMC 12.46.040A, except as otherwise provided by ordinance.

C.   It shall be unlawful for any person to store camp facilities (other than vehicles) and camp paraphernalia in any of the areas listed in AMC 12.46.040A, except as otherwise provided by ordinance.

(Ord. 6522, Added, 10/26/2011)

## 12.46.050     Penalty for violations.

Violation of any of the provisions of this chapter is a misdemeanor.

(Ord. 6522, Added, 10/26/2011)

## 12.46.060     Public duty created.

A.   It is expressly the purpose of this ordinance to provide for and promote the health, safety and welfare of the general public and not to create or otherwise establish or designate any particular class or group of persons or individual who will or should be especially protected or benefited by the terms of this ordinance.

B.   Nothing contained in this ordinance is intended nor shall be construed to create or form the basis of any liability on the part of the city, or its officers, employees or agents, for any injury or damage resulting from any action or inaction on the part of the city related in any manner to the enforcement of this ordinance by its officers, employees or agents.

(Ord. 6522, Added, 10/26/2011)

**The Aberdeen Municipal Code is current through Ordinance 6639, passed December 12, 2018.**

Disclaimer: The city clerk's office has the official version of the Aberdeen Municipal Code. Users should contact the city clerk's office for ordinances passed subsequent to the ordinance cited above.

City Website: www.aberdeenwa.gov
City Telephone: (360) 537-3231
Code Publishing Company

# APPENDIX B

BILL # 19-_____

<div align="center">ORDINANCE NO. _____</div>

<div align="center">AN ORDINANCE AMENDING ABERDEEN MUNICIPAL CODE 12.46 CAMPING ON PUBLIC PROPERTY TO COMPLY WITH RECENT COURT DECISIONS.</div>

BE IT ORDAINED BY THE MAYOR AND CITY COUNCIL OF THE CITY OF ABERDEEN:

**SECTION 1.**          **CODE CHAPTER AMENDED.**  The following Chapter 12.46 "Public Camping to the Aberdeen Municipal Code is hereby amended as follows:

**12.46.010 Findings.**  Camping on public property and on public right of ways constitute a public health and safety hazard because of the lack of proper electrical and/or sanitary facilities.  People without proper sanitary facilities have openly urinated, defecated, and littered on public property on the public right of ways.  Use of public property for camping purposes or storage of personal property interferes with the rights of others to use the areas for which they were intended.

**12.46.020 Purpose.**  It is the purpose of this ordinance to prevent harm to the health or safety of the public and to promote the public health, safety and general welfare by making public streets and other areas readily accessible to the public and to prevent use of public property for camping purposes or storage of personal property which interferes with the rights of others to use the areas for which they were intended.

**12.46.030 Definitions.**  The following definitions are applicable in this chapter unless the context otherwise requires:

A.     "Available overnight shelter" means a public or private shelter with an available overnight space, open to an individual or family unit experiencing homelessness at no charge; entry denied due to unruly behavior does not render a shelter unavailable by an individual or family unit; a shelter is NOT considered "available" under this Chapter if an individual or family unit is not able to access the shelter due to:

1.     Gender, familial or marital status, religious beliefs, disability, or a shelter's length of stay restrictions; or,

2.     Attempt to secure shelter by lining up in advance of the shelter opening, and being denied entry due to lack of space.

B.     "Camp" or "camping" means to pitch, create, use, or occupy camp facilities for the purposes of habitation, as evidenced by the use of camp paraphernalia.

C.    "Camp facilities" include, but are not limited to, tents, huts, temporary shelters, or vehicles.

D.    "Camp paraphernalia" includes, but is not limited to, tarpaulins, cots, beds, sleeping bags, blankets, mattresses, hammocks, or non-city designated cooking facilities and similar equipment.

E.    "Store" means to put aside or accumulate for use when needed, to put for safekeeping, to place or leave in a location.

F.    "Vehicle" means the same as defined in RCW 46.04.670 and vehicle "parking" means the same as defined in RCW 46.04.381, as adopted by AMC 10.04.010.

**12.46.040 Unlawful camping and storage of personal property in public places.**

A.    It shall be unlawful for any person to camp or use camp paraphernalia in the following areas, except as otherwise provided by ordinance:

1.    Public parks, except as authorized under Chapter 2.60 AMC;

2.    Any publicly-owned property to which the public is not ordinarily allowed access, including but not limited to: public buildings, water storage tank sits, well sites, storm water ponds and facilities, and other secured properties;

3.    That portion of any street or sidewalk that is expressly reserved for vehicular or pedestrian travel;

4.    Portions of any street right-of-way that is not expressly reserved for vehicular or pedestrian travel; and

5.    Any other publicly-owned parking lot or publicly-owned property, improved or unimproved.

B.    It shall be unlawful for any person to occupy a vehicle for the purpose of camping while that vehicle is parked in any of the areas listed in AMC 12.46.040A, except as otherwise provided by ordinance.

C.    It shall be unlawful for any person to store camp facilities (other than vehicles) and camp paraphernalia in any of the areas listed in AMC 12.46.040A, except as otherwise provided by ordinance.

**12.46.045 Enforcement of ordinance**

A.    Prohibitions contained in 12.46.040.A.1,2,3, and 5 shall be enforced at all times.

B.    Law enforcement shall not enforce prohibitions in 12.46.040.4 when there is no available overnight shelter for individuals or family units experiencing homelessness on the date that camping occurs

**12.46.050 Penalty for violations.**   When enforced, violation of any of the provisions of this chapter is a misdemeanor.

**12.46.060 Public duty created.**

A.      It is expressly the purpose of this ordinance to provide for and promote the health, safety and welfare of the general public and not to create or otherwise establish or designate any particular class or group of persons or individual who will or should be especially protected or benefited by the terms of this ordinance.

B.      Nothing contained in this ordinance is intended nor shall be construed to create or form the basis of any liability on the part of the city, or its officers, employees or agents, for any injury or damage resulting from any action or inaction on the part of the city related in any manner to the enforcement of this ordinance by its officers, employees or agents.

**SECTION 2.        SEVERABILITY.**  Should any section, subsection, paragraph, sentence, clause or phrase of this ordinance or its application to any person or situation be declared unconstitutional or invalid for any reason, such decision shall not affect the validity of the remaining portions of this ordinance or its application to any other person or situation.

**SECTION 3.        PUBLICATION BY SUMMARY.**  The Finance Director is authorized and directed to publish the attached summary in lieu of this ordinance.

**SECTION 4.        EFFECTIVE DATE.**  This ordinance shall take effect immediately upon its passage, signing, and publication.

**PASSED** and **APPROVED** this ___ day of _____, 2019.


_____
                    Erik Larson, Mayor

ATTESTED:


_____
Corri Schmid, Interim Finance Director

3

# APPENDIX C

# DSHS DATA

**Cash, Food, and Medical[3] Clients Reported as Homeless in the Grays Harbor County Area, By Zip Code, December 2017**

Source: ESA EMAPS Report #4397 using the ACES Data Warehouse as of the January 2018 load

This report was produced on February 8, 2018

| | Total Homeless[3] | Homeless without Housing | | Homeless with Housing | | Emergency Housing/Shelter | | Domestic Violence Shelter | |
|---|---|---|---|---|---|---|---|---|---|
| | # of Clients[3] | # of Clients[3] | % of Total Clients | # of Clients[3] | % of Total Clients | # of Clients[3] | % of Total Clients | # of Clients[3] | % of Total Clients |
| *Total* | **2,055** | **873** | **42.5%** | **1,177** | **57.3%** | **<10** | **0.2%** | **<10** | **0.0%** |
| 98520 (Aberdeen) | 1,050 | 512 | 48.8% | 535 | 51.0% | * | 0.3% | 0 | 0.0% |
| 98526 (Amanda Park) | <10 | * | 25.0% | * | 75.0% | 0 | 0.0% | 0 | 0.0% |
| 98535 (Copalis Beach) | 18 | * | 22.2% | 14 | 77.8% | 0 | 0.0% | 0 | 0.0% |
| 98536 (Copalis Crossing) | <10 | 0 | 0.0% | * | 100.0% | 0 | 0.0% | 0 | 0.0% |
| 98537 (Cosmopolis) | 32 | * | 25.0% | 24 | 75.0% | 0 | 0.0% | 0 | 0.0% |
| 98541 (Elma) | 188 | 71 | 37.8% | 115 | 61.2% | * | 0.5% | * | 0.5% |
| 98547 (Grayland) | 32 | 12 | 37.5% | 20 | 62.5% | 0 | 0.0% | 0 | 0.0% |
| 98550 (Hoquiam) | 321 | 113 | 35.2% | 208 | 64.8% | 0 | 0.0% | 0 | 0.0% |
| 98552 (Humptulips) | 10 | * | 50.0% | * | 50.0% | 0 | 0.0% | 0 | 0.0% |
| 98559 (Malone) | <10 | 0 | 0.0% | * | 100.0% | 0 | 0.0% | 0 | 0.0% |
| 98557 (McCleary) | 46 | 15 | 32.6% | 31 | 67.4% | 0 | 0.0% | 0 | 0.0% |
| 98562 (Moclips) | 14 | * | 35.7% | * | 64.3% | 0 | 0.0% | 0 | 0.0% |
| 98563 (Montesano) | 85 | 29 | 34.1% | 56 | 65.9% | 0 | 0.0% | 0 | 0.0% |
| 98566 (Neilton) | <10 | * | 66.7% | * | 33.3% | 0 | 0.0% | 0 | 0.0% |
| 98569 (Ocean Shores) | 110 | 44 | 40.0% | 66 | 60.0% | 0 | 0.0% | 0 | 0.0% |
| 98571 (Pacific Beach) | 17 | * | 35.3% | 11 | 64.7% | 0 | 0.0% | 0 | 0.0% |
| 98583 (Satsop) | <10 | * | 50.0% | * | 50.0% | 0 | 0.0% | 0 | 0.0% |
| 98587 (Taholah) | 22 | * | 36.4% | 14 | 63.6% | 0 | 0.0% | 0 | 0.0% |
| 98595 (Westport) | 95 | 36 | 37.9% | 59 | 62.1% | 0 | 0.0% | 0 | 0.0% |

**HO – Homeless without Housing** includes clients who lack a fixed, regular, and adequate nighttime residence and do not have a place to stay at the time of report.

**HH – Homeless with Housing** includes clients commonly referred to as "couch surfing", which means they do not have a fixed, regular nighttime residence, but they do have a place to stay at the time of report.

**EH – Emergency Housing/Shelter** includes clients who reside in a publicly or privately operated temporary shelter.

**BT – Domestic Violence Shelter** includes clients who reside in a publicly or privately operated temporary domestic violence shelter.

[3] Includes both adults and children recipients

# APPENDIX D

BILL # 19-___

# ORDINANCE NO. _____

### AN ORDINANCE PROHIBITING PUBLIC ACCESS TO RIVER STREET PROPERTY FOR LIFE SAFETY, PUBLIC SAFETY, AND PUBLIC WELFARE REASONS

**WHEREAS,** the City Council for the City of Aberdeen is responsible to undertake Ordinances necessary for the municipal government and management of affairs of the City, including to control and improve properties of the City; and

**WHEREAS,** the City Council is responsible to regulate the common areas of the City; and,

**WHEREAS,** the City Council is responsible to provide and enforce regulations for the protection of health, cleanliness, peace and good order of the City; and

**WHEREAS,** life safety, public safety, and public welfare considerations related to public access to property owned by the City since August 2018 require further analysis of use and access to the property.

**NOW, THEREFORE,**

**BE IT ORDAINED BY THE MAYOR AND CITY COUNCIL OF THE CITY OF ABERDEEN:**

**SECTION 1.  RIVER STREET PROPERTY DEFINED.**  The following described real property, consisting of approximately eight (8) acres, as also shown on Exhibit A attached to this Ordinance, is owned in fee simple by the City of Aberdeen:

Tax Parcel # 029901800101:

Lot 1, Tract 18, Aberdeen Tide and Shore Lands, as described in that certain Statutory Warranty Deed, dated May 6, 1980, and recorded May 19, 1980, as Auditor's File No. 166816, records of Grays Harbor County;

EXCEPT that portion conveyed to Grays Harbor County and Puget Sound Railway Company by Deed recorded April 23, 1909, and under Auditor's File No. 40019, Volume 101 of Deed, page 405, records of Grays Harbor County;

ALSO EXCEPT the following described property:

Beginning at the intersection of the Inner Harbor Line of Tract 17, Aberdeen Tide and Shore Lands, with the Southerly right-of-way line of the Oregon Washington Railroad and Navigation Company, as established by Decree of Superior Court of the State of Washington for Grays Harbor County, as recorded in Volume 29 of Miscellaneous, page 472, records or Grays Harbor County;

Thence South 51°05'46" West along said "Inner Harbor Line" a distance of 1025 feet;

Thence North 36°42'47.9" West parallel to the Southwesterly line of platted
Broadway within the Plat of Weatherwax and Benn's Addition to the City of
Aberdeen, a distance of 270 feet, more or less, to the Southerly line of said
Oregon Washington Railroad and Navigation Company;
Thence Easterly along said Southerly line a distance of 1120 feet, more or less, to
the point of beginning;
Situate in the County of Grays Harbor, State of Washington.

**SECTION 2.  FINDINGS OF LIFE SAFETY, PUBLIC SAFETY, PUBLIC WELFARE
CONCERNS.**

1. <u>Location:</u>        The undeveloped River Street property is located on a strip of land
between the Chehalis River and the Poynor Rail Yard, at one point only 250 feet between
the River and the active commercial Rail Yard.  Rail Yard operators have reported that
many people walk across the tracks, including when rail cars are moving; such activity
has led to injuries including a woman losing both her legs in a tragic accident as she was
crossing under a rail car immediately adjacent to the River Street property.  Other reports
include that vehicles driving to or from the River Street property have damaged rail
switching equipment which could lead to widespread and catastrophic incidences,
especially if a train carrying explosive methanol were to derail.

2. <u>Sanitation and Utilities:</u>        There is no permanent connection to public utility services
or sanitary systems.  The lack of sanitary systems and utilities further complicates
maintaining basic hygiene and health practices, exacerbating existing health conditions
and increasing pressure on the overtaxed public health system.

3. <u>Access:</u>        Access to the property is limited to an undeveloped City right of way.
Public safety agencies regularly respond to medical, fire and police calls at the River
Street property, and they have only one point of ingress and egress.  Once on the
property, if calls involve entering the property itself responders must navigate overgrown
and uneven grounds which are peppered with physical and medical hazards.

4. <u>Zoning.</u>        The property is zoned General Commercial. Residential uses in General
Commercial are limited to "upper floors of buildings" (AMC 17.36.020.M); individual
residences or shelters at ground level are neither permitted nor conditional uses (AMC
17.36).  There are no structures on the River Street property which meet building or
construction codes.

5. <u>FINDING:</u> In consideration of the above the City Council finds the River Street property
in its current condition to be unfit for human habitation or open public access.

**SECTION 3.  EXERCISE OF POLICE POWERS IN LIGHT OF LIFE SAFETY,
PUBLIC SAFETY, AND PUBLIC WELFARE CONCERNS.**

1. It is the purpose of this Ordinance to prevent harm to the health or safety of the public
and to promote the public health, safety and general welfare of all residents of the City of
Aberdeen.

2. Therefore, in exercise of its police powers, and consistent with Resolution # 2019-02 and
Ordinance 6641, and recognizing that any license for individuals to remain on the River

Street property expire on May 1, 2019 and will not be extended, the City Council of the City of Aberdeen prohibits all public access to the River Street property as of the effective date of this Ordinance.

**SECTION 4.  SEVERABILITY.**    Should any section, subsection, paragraph, sentence, clause or phrase of this Ordinance or its application to any person of situation be declared unconstitutional or invalid for any reason, such decision shall not affect the validity of the remaining portions of this Ordinance or its application to any other person or situation.

**SECTION 5.  PUBLICATION BY SUMMARY.**  The Finance Director, or in his or her absence the Corporation Counsel, is authorized and directed to publish a summary in lieu of this Ordinance.

**SECTION 6.  EFFECTIVE DATE.**    This Ordinance shall take effect immediately upon its passage, signing, and publication.

**PASSED AND APPROVED** this _____ day of _____, 2019.

_____
Erik Larson, Mayor

ATTEST:

_____
M. Patrice Kent, City Clerk
(Corporation Counsel)

## SUMMARY ORDINANCE NO. _____

**AN ORDINANCE PROHIBITING PUBLIC ACCESS TO RIVER STREET PROPERTY FOR LIFE SAFETY, PUBLIC SAFETY, AND PUBLIC WELFARE REASONS**

**SECTION 1.  RIVER STREET PROPERTY DEFINED.**  Tax Parcel # 029901800101:

**SECTION 2.  FINDINGS OF LIFE SAFETY, PUBLIC SAFETY, PUBLIC WELFARE CONCERNS.**

**SECTION 3.  EXERCISE OF POLICE POWERS IN LIGHT OF LIFE SAFETY, PUBLIC SAFETY, AND PUBLIC WELFARE CONCERNS.**

**SECTION 4.  SEVERABILITY.**

**SECTION 5.  PUBLICATION BY SUMMARY AUTHORIZED.**

**SECTION 6.  EFFECTIVE DATE.**    This Ordinance shall take effect immediately upon its passage, signing, and publication.

**PASSED AND APPROVED** this ____ day of _____, 2019.


/S/ E.L._____
Erik Larson, Mayor


ATTEST:
/S/ MPK_____
M. Patrice Kent, City Clerk
(Corporation Counsel)

# APPENDIX E

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Honorable Ronald B. Leighton

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

REVEREND SARAH MONROE; TIM
QUIGG; and APRYL OBI BOLING,

                Plaintiffs,

        v.

CITY OF ABERDEEN, a municipal
government; ERIK LARSON, Mayor of the
City of Aberdeen; and KRIS KOSKI, City
Engineer,

                Defendants.

NO. 3:18-cv-05949-RBL

ORDER ON PARTIES' STIPULATED
JOINT MOTION

      THIS MATTER having come before the above-title Court upon the stipulated joint

motion of the Parties, and the Court having examined the records on file, and being fully advised

in the matter, now, therefore

      IT IS HEREBY ORDERED that:

      1.      The City shall not require any visitor who wishes to enter the River Street

property to obtain any permit, or any kind of advance permission or authority to do so.

      2.      Visitors wishing to enter the property may not be required to register with the

City, or to identify themselves for purposes of entering the property.

      3.      The following time, manner and place restrictions shall apply to visitors to the

River Street property.

      ***Time.***

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

4.      With the exception of emergency visits, all visitors to the property shall make their visits between the hours of 8 a.m. and 8 p.m.

5.      Emergency visits are those related to a health or safety emergency where the risk of death or serious injury or sickness to a person on the property appears imminent.

6.      In any emergency situation, whether during or outside the regular access hours, the visitor shall immediately call the 911 emergency dispatch system for an appropriate public safety agency response.

7.      Public safety agencies have unrestricted access through the otherwise locked gate located on the City unimproved right-of-way at "H" Street and River Street.

*Place.*

8.      Entrance to the property shall be by way of the unimproved City right-of-way located at the northeast corner of the property (the "H" Street entrance).

*Manner*.

9.      Visitors will obey all laws at all times.

10.     Visitors will not bring any alcohol onto the property.

11.     Visitors will not bring any weapons onto the property.

12.     With the exception of medicines prescribed by a doctor, visitors will not bring any drugs onto the property.  They may bring prescription medicines onto the property only if (a) the medicine is prescribed for use by the visitor, or (b) the medicine is prescribed for use by a person living on the property.

13.     Visitors will not go onto or cross railroad tracks, except at a designated railroad crossing.  Visitors will stay at least 45 feet away from rail cars.

14.     Visitors will use portable toilet facilities provided by the City.  The City will continue to arrange for regular servicing of all portable toilets so that they do not become full and/or unusable.   Visitors shall not use waste pits or compostable toilets to relieve themselves.

ORDER ON PARTIES' STIPULATED JOINT MOTION – 2
(3:18-cv-05949-RBL)

MON037-0001 5621477

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

15.     Visitors shall use City provided dumpsters and/or trash containers and shall not dispose of any garbage on the property except by depositing garbage or refuse in such dumpsters or containers.   Visitors shall not bring waste onto the property in order to access City-provided dumpsters.  The City shall continue to arrange for regular trash pick-up so that trash containers do not become full and unusable.

16.     The City will not interfere with the delivery of food, clothing, fuel/firewood, and health and hygiene supplies by visitors.

17.     Visitors will not deliver fuel/firewood to the property without assurances from those to whom it is delivered that the fuel/firewood will be used in apparatuses according to manufacturers' specifications, or in approved fire pits as prescribed by the Aberdeen Fire Department, whichever is applicable.

**Deliveries made by vehicle.**

18.     The Parties agree that there may be times that visitors require access to the property by vehicle rather than pedestrian access for the delivery of food, clothing, fuel/firewood, and health/hygiene products not readily carried or brought into the site by pedestrians.  In respect of the acknowledged public and life safety considerations, the City will provide the following vehicle access through the gate on the unimproved City right of way located at "H" Street and River Street for such deliveries: (a) on Tuesdays between the hours of 2:30 and 4:30 p.m.; and (b) on Thursdays between the hours of 9:00 and 11:00 a.m.; except for emergency circumstances in which the City is prevented from reaching the site. The gate will be staffed by City employees and any vehicles accessing the property must be removed by closing time or be subject to tow.

## I.     CLAIMS AND ISSUES RESERVED

19.     Entry of this order renders the Plaintiffs' TRO motion and their requests for injunctive relief moot.

ORDER ON PARTIES' STIPULATED JOINT MOTION – 3
(3:18-cv-05949-RBL)

MON037-0001 5621477

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

1     20. This order does not address, and does not in any way resolve, the Plaintiffs' claims

2  for damages and for an award of attorneys' fees and costs.   If the parties cannot come to an

3  agreement for a proposed resolution of these claims and issues, the Plaintiffs may proceed to

4  litigate these matters.

5     DATED this 28th day of December, 2018.

6

7

8     Ronald B. Leighton
9     United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER ON PARTIES' STIPULATED JOINT MOTION – 4
(3:18-cv-05949-RBL)

MON037-0001 5621477

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020