1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Honorable Ronald B. Leighton

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

ELIZABETH AITKEN, JOSHUA ALLAN FRANCIS, MICHELLE HINKLE, LEONARD VERVALEN, CRAIG MATTHEW ALLISON, SHAWNA BAKER, ANDREW COMENOUT-McMINDS, MISTY ALANA MICHEAU, REVEREND SARAH MONROE, and APRYL OBI BOLING,

                Plaintiffs,

       v.

CITY OF ABERDEEN, a municipal government,

                Defendant.

NO. 3:19-cv-05322-RBL

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

NOTE ON MOTION CALENDAR: April 29, 2019

ORAL ARGUMENT REQUESTED

**Emergency motion: Relief sought on or before May 8, 2019 4:00 pm**

## I.    INTRODUCTION

The City of Aberdeen has enacted a string of anti-homeless laws in recent years.  In the past month and a half, the City of Aberdeen has amended its anti-camping ordinance and has nearly completed the process of enacting legislation that will effectively evict the homeless people living at River Camp from the land that some of them (such as Hinkle and Vervalen) have been living on for as long as eight years.  If the Court does not act to prevent it, on May 9, 2019, the Plaintiffs are very likely to be forced off the public land that they have been living

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER – 1
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

on for years.[1]  At the very same time that the City is moving swiftly to make it unlawful for them to live on that land, the City has also made it virtually impossible for them to live anywhere at all within the city limits.

The City is forcing the Plaintiffs off the River Camp land and justifies this action on the ground that the land is not fit for human habitation.  The City pretends that it is taking this action because it wants to protect the Plaintiffs, but the City offers the Plaintiffs no alternative places where they can live.  It is undisputed that within Aberdeen there is not sufficient emergency shelter that can accommodate them and the plaintiffs cannot afford private housing. Having made it unlawful for the Plaintiffs to "camp" virtually anywhere in the City, the City is simply weeping crocodile tears and bemoaning the fact that there is no place for the Plaintiffs to go.  Armed with laws that authorize police to prevent the homeless from pitching their tents on public property, the Aberdeen police, having been effectively deprived of virtually all discretion to choose not to enforce the anti-camping law, will soon be required to make the homeless "move on."

But there is nowhere within Aberdeen to "move on" to and that is precisely the point. The City of Aberdeen is preparing to drive the homeless out of the city altogether.  Where they go is of no concern to Aberdeen.  Having effectively erected an invisible "wall" against homeless people who want to continue to reside in Aberdeen, the City is driving them out.  So long as they leave it is of no consequence to Aberdeen whether they end up "camping" in Hoquiam, Montesano, Olympia, Seattle, or anywhere else.  One City Councilmember stated "that Olympia and Seattle give bus tickets to the homeless and encourage them to move to Aberdeen." *Declaration Reverend Boneta Campbell, ¶12.*

As Reverend Campbell relates, Aberdeen City Councilmembers have said publicly that they "wanted to enact ordinances that would make it difficult for homeless people to live in

---

[1] *See Declaration of Apryl Obi Boling*, ¶8 and *Declaration of Todd Maybrown and Certificate of Compliance*, regarding the approval of Ordinance 19-05 at the April 24, 2019 City Council Meeting and the City's announced intent to adopt the ordinance when it receives its third reading on May 8, 2019.

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER – 2
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Aberdeen" and "they said they had gotten a number of ideas from people in other cities who had enacted laws that made life more difficult for the homeless people living in their cities." *Id.*, ¶9.  For example, they "felt that a law against possessing a shopping cart would make it harder for the homeless to exist because they would have a reduced ability to transport their belongings, such as tents and sleeping bags and cooking utensils." *Id.*, ¶10.

The Plaintiffs now move this Court to enter a temporary restraining order that prohibits the City of Aberdeen from enforcing ordinances which will make it unlawful for homeless people to live anywhere within the City limits.  In effect, these laws will banish every homeless person from that community.  Effective May 2, 2019, the combined effect of Aberdeen's laws will be to violate the Plaintiffs' rights to freedom of travel; freedom from Cruel and Unusual Punishment under the Eighth Amendment; to freedom from Cruel Punishment under article 1, section 14 of the Washington Constitution; and to substantive due process guaranteed by the Fourteenth Amendment.

## II.     EVIDENCE RELIED UPON

Plaintiffs rely upon the following evidence:

1.     Declaration of Elizabeth Aitken

2.     Declaration of Joshua Allan Francis

3.     Declaration of Michelle Hinkle and Leonard Vervalen

4.     Declaration of Craig Matthew Allison

5.     Declaration of Misty Alana Micheau

6.     Declaration of Reverend Sarah Monroe

7.     Declaration of Reverend Boneta Campbell

8.     Declaration of James E. Lobsenz

9.     Declaration of Apryl Obi Boling

10.    Declaration of Toni Nickel

11.    Declaration of Todd Maybrown for Certification of Compliance with LR 65(b).

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING
ORDER – 3
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

### III.     THE NINTH CIRCUIT'S DECISION IN *MARTIN v. BOISE*

On September 14, 2018, the United States Court of Appeals issued a decision in *Martin v. Boise,* 902 F.3d 1031 (9th Cir. 2018), *amended and superseding opinion on denial of rehearing*, ___ F.3d ___ (April 18, 2019).  In *Martin* the Court held that the Cruel and Unusual Punishment Clause of the Eighth Amendment is violated when a city attempts to punish the homeless for sleeping outdoors on public property.

After *Martin* was decided, in February of 2019 the Aberdeen City Council substantially amended its anti-camping ordinance (Aberdeen Municipal Code §§12.46.010 *et seq.*) in a number of ways by (1) broadening the scope of the prohibition against camping, making it applicable, inter alia, to *any* publicly owned property (*See* new §12.46.040(A)(5)); making enforcement of the law against camping mandatory at almost all times; and (3) changing the classification of unlawful camping from a misdemeanor criminal offense to a civil infraction. These amendments did not cure the constitutional infirmities inherent in Aberdeen's laws.  To the contrary, when viewed alongside related ordinances that target homeless persons within the City limits, it is clear that the City of Aberdeen is intending to eradicate the "homelessness problem" through a system of unconstitutional punishment, and ultimately banishment.

### IV.

### ABERDEEN'S ANTI-CAMPING ORDINANCE AND THE APRIL 2019 AMENDMENTS TO THAT LAW.

### 1.     The City's Original Anti-Camping Ordinance.

Aberdeen Municipal Code ("AMC") §12.46 was first enacted in October of 2011 by Ordinance No. 6522.  As originally enacted, §12.46.040 made it unlawful to camp in certain designated areas as follows:

A.     It shall be unlawful for any person to camp or use camp paraphernalia in the following areas, except as otherwise provided:

   1.     Public parks, except as authorized under Chapter 2.60 AMC;

   2.     Public streets, sidewalks, or other improved or unimproved public rights of way;

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING
ORDER – 4
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

3.    Publicly owned or maintained parking lots or other publicly owned or maintained areas, improved or unimproved.

B.    It shall be unlawful for any person to occupy a vehicle for the purpose of camping while that vehicle is parked in any of the areas listed in AMC 12.46.040A, except as otherwise provided by ordinance.

C.    It shall be unlawful for any person to store camp facilities (other than vehicles or cars) and camp paraphernalia in any of the areas listed in §12.46.040A, except as otherwise provided by ordinance.

As originally enacted, AMC §12.46.050 made the violation of this law a misdemeanor offense.[2] The definitional section of the ordinance, §12.46.030, made it clear that "camping" included living in these areas, and that "camp facilities" included the tents and temporary shelters that homeless people often live in.[3]

### 2.    The 2019 Amendments Enlarging the Scope of the Prohibition Against Camping so that it now Covers *All* Publicly Owned Property.

Recently, in February of 2019, the Aberdeen City Council amended subsection A of §12.46.040.  The amendments make it even clearer that there is no place within the city where it is lawful for homeless people to live in tents or temporary shelters.  In addition to the pre-existing language that banned camping in publicly owned "parking lots or other publicly owned or maintained areas, improved or unimproved," the amended ordinance now prohibits camping on all public land "to which the public is not ordinarily allowed access" and on "any other publicly-owned parking lot or publicly-owned property."  It also clarifies that the prohibition against camping applies to all streets and sidewalks.  §12.46.040(A) now reads as follows:

A.    It shall be unlawful for any person to camp or use camp paraphernalia in the following areas, except as otherwise provided by ordinance:

1.    Public parks, except as authorized under Chapter 2.60 AMC;

2.    ***Any publicly owned property to which the public is not ordinarily allowed access***, including but not limited to public

---

[2] "Violation of any of the provisions of this chapter is a misdemeanor."

[3] "'Camp' or 'camping' means to pitch, create, use or occupy camp facilities ***for the purposes of habitation***, as evidenced by the use of camp paraphernalia."  §12.46.030(A) (emphasis added).  "'Camp facilities' include, but are not limited to, ***tents, huts, temporary shelters or vehicles***." §12.46.030(B) (Emphasis added).

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER – 5
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

buildings, water storage tank sites, well sites, storm water ponds and facilities, and other secured properties.

3. That portion of any street or sidewalk *that is expressly reserved* for vehicular or pedestrian travel;

4. Portions of any street right-of-way *that is not expressly reserved* for vehicular or pedestrian travel; and

5. *Any other* publicly-owned parking lot or *publicly-owned property,* improved or unimproved.

(Emphasis added).

While one subsection read in isolation might seem to be something less than all-inclusive, when all the subsections are read together it is evident that it has now become unlawful to "camp" *anywhere* in the City of Aberdeen.  Because subsection (A)(2) is ostensibly limited to public property "to which the public is not ordinarily allowed access," this might seem to leave open other "public properties" where the public *is* ordinarily allowed access.  But subsection (A)(5) forecloses any such reading by extending the ban to "any other . . . publicly owned property."  Similarly, reading subsection (A)(3) alone might lead one to conclude that only those portions of streets that are "expressly reserved" for vehicles or pedestrians are covered by the ban.  But subsection (A)(4) forecloses any such reading by banning camping on any portion of a street "that is *not* expressly reserved" for vehicles or pedestrians.

### 3. The Expression of Concern for the Safety of the People Camping on Public Property was Eliminated from the Law's Findings.

A number of other changes were made to AMC Chapter 12.46.  First, the "Findings" section of the law was amended to eliminate the reference to the concern for the public health and safety of the people living on public property.  Originally, §12.46.010 read:

*People* camping on public property and on public right of ways *create* a public health and safety hazard because of the lack of proper electrical and/or sanitary facilities *for these people*.  People without proper sanitary facilities have openly urinated, defecated, and littered on public property on the public right of ways. Use of public property for camping purposes or storage of personal property interferes with the right of others to use the areas for which they were intended.

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER – 6
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

(Emphasis added).  The February 2019 amendment to §12.46.010 eliminated the first word ("People"), eliminated the phrase "for these people," and changed the word "create" to the word "constitute."  *See Id.*

### 4.   <u>Unlawful Camping Has Been Reclassified as a Civil Infraction.</u>

Initially, an amendment to AMC §12.46.050 was proposed that would have changed the wording of the ordinance so that it stated that "*When enforced* violation of any of the provisions of this chapter is a misdemeanor." (Italics added).  However, the *Daily World* newspaper reported on February 15, 2019 that on February 13th when the City Council considered the amendments to AMC Chap. 12.46, Council Member Jeff Cook proposed an amendment which changed violations of the anti-camping ordinance to a civil infraction and that amendment was approved.[4]

The recent amendment also changed the enforcement of the anti-camping ordinance by adding new §12.46.045.  This new law provides that four of the five prohibitions in §12.46.040(A) shall *always* be enforced and that one of them is not be enforced when there is a lack of available overnight shelter.  AMC §12.46.045 provides as follows:

§12.46.045   Enforcement of ordinance

A.   Prohibitions contained in 12/46/040.A.1,2,3, and 5 shall be enforced at all times.

B.   Law enforcement shall not enforce prohibitions in 12.46.040.4 when there is no available overnight shelter for individuals or family units experiencing homelessness on the date that camping occurs.

*Id.*  The law does not set forth any criteria for determining how it is to be determined whether there is some available overnight shelter for the homeless, or who shall make that determination, or when that determination is to be made.  Presumably, since the ordinance directs that the law shall not be enforced "on the date that camping occurs," that determination is to be made anew

---

[4] A copy of the Feb. 15, 2019 *Daily World* newspaper article is attached to the supporting *Decl. Lobsenz*, ¶6.  *See* http://www.thedailyworld.com/news/council-finalizes-homeless-policies-in-aberdeen/

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER – 7
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

every single day.  Thus it seems likely this determination will be made sometime in the evening of each day.  The law does not say who is to make this determination, but presumably some police officer or police official is supposed to make this determination.

Moreover, as the declaration of Plaintiff Monroe attests, for the past several years there has always been a shortage of available overnight shelter in Aberdeen.  *Decl. Monroe*, ¶¶ 25-34.  Data collected by the Washington Department of Social and Health Services established that in December of 2017 there were 512 people who were homeless without housing – i.e., completely without any shelter.  *Id.*, ¶ 28.  The situation has only gotten worse since then.  *Id.*, ¶ 29.  The number of available shelter beds has declined so that today there are only 80 shelter beds in Aberdeen.  *Id.* In sum, on virtually every night of the year, there is "no available overnight shelter" for approximately 432 homeless people.  *Id.,* at ¶ 29.  Thus, the amended ordinance now seems to call for some unknown police official to either (1) make a blatantly false determination that there is available overnight shelter, when in fact there never is; or (2) to make an essentially meaningless "determination" because the truth is that there is *always* a shortage of overnight shelter.

But even if Aberdeen police refrained from enforcing Subsection (A)(4) of the anti-camping statute, this would not alleviate the problem for the Plaintiffs or for any of the homeless in Aberdeen for two reasons.  First, Subsection (A)(4) applies to "[p]ortions of any street right-of-way ***that is not expressly reserved*** for vehicular or pedestrian travel."  But to the best of Plaintiffs' knowledge, *all* streets rights of way are expressly reserved for vehicular or pedestrian travel.  That is what streets are for, after all.  So directing police not to enforce the anti-camping law in places that do not exist is meaningless.

Second, assuming for the sake of argument that somewhere in Aberdeen there are streets that are *not* expressly reserved for vehicular or pedestrian travel, it is impossible for the homeless to know which streets they are.  If the City were to erect signs that identified street right-of-ways that are not expressly reserved for cars and pedestrians, then the homeless could

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER – 8
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

1  arguably camp there.  But without signage there is no way for the homeless to know which

2  streets they are.  Again, it would seem that the City is leaving it up to individual police officers

3  to decide, in a completely arbitrary and ad hoc basis, which streets they will chose to identify

4  as "not" expressly reserved for cars and pedestrians.

5  **5.   AMC §12.46.040(A) is Incomprehensible.**

6  The City may attempt to argue that this new ordinance is not intended to prohibit

7  camping at every public location within the City limits.  However, as written it is impossible to

8  identify any location where it would not be unlawful to camp.

9  "The void for vagueness doctrine arose as an aspect of Fourteenth Amendment due

10  process in the context of criminal statutes because it was thought unfair to punish persons for

11  conduct which they had no notice could subject them to criminal punishment."  *Filippo v.*

12  *Bongiovanni*, 961 F.2d 1125, 1135, (3d Cir. 1992).  Over time, however, the doctrine expanded

13  to cover civil laws and civil repercussions.  *See. e.g., Village of Hoffman Estates v. Flipside,*

14  *Hoffman Estates*, 455 U.S. 489, 498-99 (1982); *Boutilier v. INS*, 387 U.S. 118, 123-24 (1967).

15  The Washington courts have noted that there is "no distinction between vagueness tests

16  applicable to civil and criminal proceedings."  *Mays v. State*, 116 Wn. App. 864, 869, 68 P.3d

17  1114 (2003).  *See also Matter of Troupe*, 4 Wn.App.2d 715, 720-25 (2018).  Notably, in recent

18  years, the Supreme Court has revitalized the void-for-vagueness doctrine in both criminal

19  and civil cases.  *See, e.g., Johnson v. United States*, 135 S.Ct. 2551 (2015) (upholding

20  vagueness challenge to a provision of the Armed Career Criminal Act ("ACCA"). (Federal

21  criminal law prohibits convicted felons from possessing firearms); *Sessions v. Dimaya*, 138

22  S.Ct. 1204 (2018) (upholding vagueness challenge to a provision of the INA).

23  Under this doctrine, a law violates due process if it "fails to provide people of ordinary

24  intelligence a reasonable opportunity to understand what conduct it prohibits" or "encourages

25  arbitrary and discriminatory enforcement."  *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *accord*

26  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). "Objections to vagueness under the Due Process

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING
ORDER – 9
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988). In addition, the Supreme Court has upheld vagueness challenges to laws that "involve statutory language that is not reasonably definite and that leaves room for discretion." *Bradway v. Cate,* 588 F.3d 990, 993 (9th Cir. 2009).

Insofar as AMC §12.46.040(A) is intended to describe locations where a homeless person can – and cannot – lawfully camp within the City, it is utterly incomprehensible. This Court should find that this ordinance fails to provide reasonable notice to the Plaintiffs in this case. This Court should also find that the ordinance encourages arbitrary and discriminatory enforcement by the law enforcement officers within the City of Aberdeen.

## V.   ABERDEEN'S SIDEWALK LAW

Aberdeen Municipal Code §12.44.040 was enacted in 2006. It prohibits the obstruction of streets and sidewalks as follows:

> No person shall place or cause to be placed or keep or suffer to remain, *any article in any street or on any sidewalk of the city, so as to obstruct the free use and passage thereof without first obtaining a permit* from the city. This section shall not be construed to prohibit merchants or others, from placing goods, wares and merchandise, household furniture and other commodities, on the sidewalk for the purpose of loading or unloading, providing the same be removed without unreasonable delay.

*Id.* (emphasis added). Most of the homeless people living at River Camp are living in tents. A tent is an "article" which, if pitched on a street or on a sidewalk, would naturally tend to "obstruct the free use and passage" of the street or sidewalk. This law has been used in the past to prevent the homeless from living or sleeping in a tent pitched on a city street or sidewalk.

The penalty for violation of §12.44.040 is set out in §12.44.050 which states:

> Any person willfully violating any of the provisions of this chapter shall *upon conviction* thereof, pay a fine of not less than one dollar ($1.00) nor more than fifty dollars ($50.00) and costs of prosecution, and in default of the payment of said fine and costs *shall be committed to the city jail until such fine and costs are paid, not exceeding thirty days.*

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER – 10
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

1

*Id.* (emphasis added).

2

Thus, unlike the anti-camping ordinance, which was recently amended so as to reduce

3

the level of the offense from a misdemeanor to an infraction, the offense of obstructing a street

4

or sidewalk remains a criminal offense.  This statute was not amended when the anti-camping

5

statute was amended.  Accordingly, even if Aberdeen completely and totally ceases to enforce

6

its anti-camping ordinance against the homeless because there is a lack of available shelter,

7

there is nothing in the street obstruction law that calls for non-enforcement during periods of a

8

lack of available shelter.  Thus, the homeless who pitch their tents on any street or on any

9

sidewalk will be subject to criminal prosecution for the obstructing offense no matter what

10

policy is followed with regard to the anti-camping ordinance.

11

Lastly, it should be noted that pursuant to §12.44.060, Aberdeen has an express policy

12

of "strict" enforcement of this law, and it entrusts enforcement to a special department.  This

13

statute reads:

14

> It is made the special duty of the street commissioner of the city of Aberdeen,
> his assistants and employees, to see that the provisions of this chapter are ***strictly***

15

> ***enforced and to cause the arrest of any person or persons violating the same.***

16

(Emphasis added).  Pursuant to this ordinance, the arrest of anyone – homeless or not – who

17

obstructs a street or sidewalk by putting a tent on it, is mandatory.  As noted below, as applied

18

to the homeless this ordinance blatantly violates the Eighth Amendment prohibition against

19

cruel and unusual punishments under the recent Ninth Circuit decision in *Martin*.

20

## VI.    ABERDEEN'S ORDINANCE 19-5 "CLOSING"
## RIVER CAMP EFFECTIVE IMMEDIATELY UPON PASSAGE.

21

22

On the evening of April 10, 2019, the Aberdeen City Council had a first reading of

23

proposed Aberdeen City Ordinance No. 19-5.  *Decl. Lobsenz*, ¶ 4.  There was only one day's

24

advance notice that this proposed ordinance was going to be considered at the City Council

25

Meeting.  The original notice for the April 10, 2019 City Council meeting did not mention this

26

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING
ORDER – 11
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

proposed ordinance.  Notice was given to the *Daily World* newspaper on April 9.[5]   This proposed ordinance, once enacted, will prohibit anyone from being on the River Camp property. Thus, not only "camping" will be prohibited there; no person will be permitted to go onto that public land.

### 1.   The City's Professed Safety Concerns for "the Public" are Illusory.

Following a recitation of several "CONCERNS," Section 2 of Ordinance No. 19-5 states the following "Finding":  "In consideration of the above the City Council finds the River Street property in its current condition to be unfit for human habitation or open public access."  Section 3 of Ordinance No. 19-5, entitled "Exercise of Police Power in Light of Life Safety, Public Safety, and Public Welfare Concerns," provides as follows:

> 1.   It is the purpose of this ordinance to prevent harm to the health or safety of the public and to promote the public health, safety and general welfare of all residents of the City of Aberdeen.
>
> 2.   Therefore, in exercise of its police powers, and consistent with Resolution #2019-02 and Ordinance 6641, and ***recognizing that any license for individuals to remain on the River Street property expire om May 1, 2019 and will not be extended, the City Council of the City of Aberdeen prohibits all public access to the River Street property as of the effective date of this Ordinance.***

*Id.* (emphasis added).

While the law thus makes reference to safety of the general public welfare and the safety of the public, as a practical matter, "the public" simply does not go onto the River Street property.  As noted in Reverend Monroe's declaration, there is no reason for the public to go there because there are no businesses on the property, and the only structures on the property are the tents and shelters of the homeless people living there.  Moreover, the land is covered with garbage, much of which consists of large items of junk that have been dumped on the property over the past several decades.  Things like rusted vehicles, scrap iron, and plastic and

---

[5] *Decl. Lobsenz*, ¶ 2, attached email from Mayor Larson to media representatives.

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING
ORDER – 12
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

metal containers abound.  *Decl. Monroe,* ¶ 21.  The property does have a lot of garbage that is also related to the people living there – clothes, food, garbage, old tents, and drug paraphernalia. *Id.*

The only people besides the homeless residents of River Camp who ever go on the property are social workers and clergy who are counseling and assisting the residents, the very occasional police officer, and sanitation workers who occasionally come and pick up and haul away garbage.

### 2.   The "Closure" Law is Immediately Effective Upon Passage.

Ordinance 19-5 states, in Section 6:  "The ordinance shall take effect *immediately* upon passage, signing and publication." (Emphasis added).

### 3.   The Ordinance Was Passed at its First Reading on April 10.

The City Council heard public comment on proposed Ordinance No. 19-5 on the evening of April 10.  The ordinance was debated and the Council members voted 12 to 1, with one member abstaining, to adopt it.

### 4.   The Ordinance was Passed at its Second Reading on April 24 and is Scheduled for Final Approval and Adoption on May 8th.

At its April 24 meeting the City Council read the ordinance for the second time and approved it again.  *Decl. Apryl Obi Boling,* ¶8.  The Mayor stated that the ordinance would receive its third and final reading at the City Council meeting scheduled for May 8.  *Id.*  The ordinance states it is to take effect immediately upon passage.  Therefore, Plaintiffs believe the ordinance will go into effect on the evening of May 8 once it is approved at that City Counsel meeting.

### 5.   The Combined Effect of the "Closure" Law and the Amended Anti-Camping Ordinance is to Make it Unlawful for the Homeless to "Camp" Anywhere in Aberdeen.

The 2019 amendments to Aberdeen's anti-camping law have already gone into effect.  Those amendments broadened the scope of the prohibition against "camping," making it

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER – 13
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

applicable, inter alia, to *any* publicly owned property. *See* new §12.46.040(A)(5).  Once the River Camp "closure law" is finally enacted and goes into effect, the combined effect of all of Aberdeen's ordinances will make it illegal for the homeless to live anywhere within the City.

## VII.

### REASONS WHY A TEMPORARY RESTRAINING ORDER SHOULD BE GRANTED

**A.**    **Aberdeen's Ordinances Violate the Plaintiffs' Right to Freedom of Travel.**

**1.**    **Once the "Closure" Law is Finally Adopted Enforcement of the City's Ordinances Will Force all Homeless People to Migrate to a Different City.**

There is both a federal constitutional right to freedom of interstate travel and a state constitutional right to freedom of intra state travel. "[L]ong ago," the Supreme Court "recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement." *Shapiro v. Thompson*, 394 U.S. 618, 629 (1969).  *Accord United States v. Guest*, 383 U.S. 745, 757-58 (1966).  The federal constitutional right, "which, of course, includes the right of 'entering *and abiding in* any state in the Union," [citation] "is *not* a mere conditional liberty subject to regulation and control under conventional due process or equal protection standards." *Shapiro,* at 642-43 (Stewart, J., concurring) (italics added), quoting *Truax v. Raich*, 239 U.S. 33, 39 (1915).  *Accord Dunn v. Blumstein*, 405 U.S. 330, 338 (1972).  This federal freedom was acknowledged to be the equivalent of the parallel right to freedom to travel within the States.  *Shapiro,* 394 U.S. at 630, citing *the Passenger Cases*, 7 How. 283, 492, 12 L. Ed. 702 (1849).[6]  *See also Williams v. Fears*, 179 U.S. 270, 274 (1900) ("[T]he right to remove from one place to another according to inclination, is an attribute of personal liberty, and the right, ordinarily, of free transit from or through the territory of any state is a right secured by

---

[6] "We are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, *as freely as in our own States.*" (Italics added).

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING
ORDER – 14
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

the 14th Amendment and by other provisions of the Constitution."); *Johnson v. City of Cincinnati,* 310 F.3d 484, 498 (6th Cir. 2002) ("In view of the historical endorsement of a right to intrastate travel and the practical necessity of such a right, we hold that the Constitution protects a right to travel locally through public spaces and roadways.").

## 2.    The Goal of Deterring Poor People from Migrating Into a City or State is Constitutionally Impermissible.

In *Shapiro* the Court struck down statutes in Connecticut, Pennsylvania and the District of Columbia because they burdened the right to freedom of interstate travel.  These statutes restricted or denied the availability of welfare benefits to persons who had recently migrated into these jurisdictions and thereby discouraged the poor from moving to them.  For example, persons moving into Connecticut had to wait for one year before they could receive public assistance. The Supreme Court acknowledged that these laws seemed deliberately adopted for the purpose of keeping the poor out. *Shapiro*, 394 U.S. at 628 ("There is weighty evidence that exclusion from the jurisdiction of the poor who need or may need relief was the specific objective of these provisions.").[7]

Although it was certainly "rational," in one sense, to want to keep down the cost of public assistance, the Supreme Court held that a law motivated by the purpose of inhibiting migration into the State in order to save money was unconstitutional *per se*:

> We do not doubt that the one-year waiting-period device is well suited to discourage the influx of poor families in need of assistance.  An indigent who desires to migrate, resettle, find a new job, and start a new life will doubtless hesitate if he knows that he must risk making the move without the possibility of falling back on state welfare assistance during his first year of residence, when his need may be most acute.  ***But the purpose of inhibiting migration by needy persons into the State is constitutionally impermissible***.

*Shapiro*, 394 U.S. at 629 (emphasis added).  The same legislative purpose motivated the law struck down in *Edwards v. California*, 314 U.S. 160 (1941).  There the Court struck down the

---

[7] When Congress members expressed support for the elimination of residence requirements their opponents "stressed the fears of the States that elimination of the requirements would result in a heavy influx of individuals into States providing the most generous benefits." *Shapiro,* at 628.

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER – 15
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

law as violating the interstate commerce clause because the travel regulated in that case did cross state lines.  The motive for passing the law was, like the laws struck down in *Shapiro*, to prevent the migration of the poor from increasing the financial burden on the State – California – into which citizens were migrating.

### 3.    The Constitutional Right to Freedom of Intrastate Travel has Long Been Recognized in Washington State.

In *Eggert v. Seattle*, 81 Wn.2d 840, 505 P.2d 801 (1973), after tracing the ancient lineage of the right to freedom of travel back to the Magna Charta,[8] the Washington Supreme Court expressly held that the constitutional right to freedom of travel applied to intrastate travel as well as to interstate travel:

> The right to travel is a right applicable to intrastate as well as interstate commerce.  Inasmuch as the right to travel is not based on the commerce clause, it does not depend on the interstate nature of travel. [Citations].  Rights, such as the right to travel, which involve personal liberty are not dependent on state lines.  Both travel within and between states is protected.

*Egbert*, 81 Wn.2d at 845.[9]  *Accord Spokane v. Port*, 43 Wn. App. 273, 274, 716 P.2d 945 (1986) ("This fundamental constitutional right applies both to interstate and intrastate travel."); *State v. Schimelpfenig*, 128 Wn. App. 224, 115 P.3d 338 (2005) ("Constitutional right to travel . . . includes the right to travel within a state").

In *Macias v. Department of Labor & Industries*, 100 Wn.2d 263, 668 P.2d 1278 (1983), the Washington Supreme Court held that restrictions or penalties imposed on the fundamental right to travel violate both the federal constitution and the Washington State Constitution. There the Court struck down a state law purported to restrict the availability of workmen's compensation for job related injuries for agricultural farmworkers who traveled from one farm

---

[8] "Concern over the right to travel has historically been a concern of both English and American people.  The recognition of the importance of freedom of movement ranges from the declaration in the Magna Charta allowing every free man to leave England except during wars, to article 13, section 1 of the Universal Declaration of Human Rights of the United nations which declares 'Everyone has the right to freedom of movement *and residence* within the borders of each State.'" *Eggert*, at 841 (italics added).

[9] In *Eggert* the plaintiff successfully challenged the employment preference that the City of Seattle gave to job applicants who had lived in Seattle for at least one year.

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER – 16
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

to another within the State:  "[W]e conclude that the statute in question constitutes a penalty on appellants' fundamental right to travel by denying them the basic necessities of life."  *Macias,* 100 Wn.2d at 274.  Expressing doubt that the statute could even survive the rational basis test, the Court held that the State's interests did not "rise to the level of a compelling state interest, as is required to justify the present infringement upon appellant's fundamental rights."  *Id.*  The Court also held that "our state constitution privileges and immunities clause, Const. art. 1, §12 independently supports our conclusion that this provision denies appellants equal protection of the law."  *Id.*

### 4.   Driving Poor People Out of a Place Where they Currently Live is Just as Constitutionally Impermissible as Fencing Out Poor People who Currently Live Outside the Jurisdiction by Discouraging them from Moving In.

As this case shows, some cities are already disproportionately inhabited by the poor. The percentage of homeless people living in Grays Harbor County is well above the state average.  Aberdeen city officials may wish that the homeless people living at River Camp would all pack up and move to Olympia or Seattle (where arguably more public money is available to provide them assistance, and more public money is being spent for that purpose).[10]  But it is equally constitutionally impermissible to drive out homeless people currently living in Aberdeen and to motivate them to move to other Washington cities as it is to fence out homeless people currently in those cities who wish to move to Aberdeen.

By making it unlawful for River Camp residents to "camp" – i.e. to *live* on any public property within the city limits – Aberdeen is forcing them to choose between breaking the law, and being continually fined for such law illegal behavior, or migrating out of Aberdeen.  Putting them to such a choice, and attempting to induce them to leave the city, is constitutionally impermissible.  It burdens the right of freedom to travel by penalizing them for exercising their right *not* to travel.

---

[10] "More fundamentally, a State may no more try to fence out those indigents who seek higher welfare benefits than it may try to fence out indigents generally."  *Shapiro*, 394 U.S. at 631.

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER – 17
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

The First Amendment constitutional right to speak includes the correlative right not to speak, *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (persons could not be compelled to display message "Live Free or Die.")  The Fifth Amendment constitutional right not to testify includes the correlative right to decide *not* to remain silent and to take the witness stand and testify at one's trial.  *See, e.g., Rock v. Arkansas*, 483 U.S. 44, 51 (1987) (defendant has both a right not to testify and a right to testify).  The constitutional right to freely worship and practice one's religion includes the right *not* to worship.  Similarly, the constitutional freedom to travel encompasses the correlative freedom *not* to travel.  It includes the right *not* to migrate.  And for many people, including many of the plaintiffs in this case, the right to continue to live in Aberdeen, where many of them grew up, worked, and went to school, and where their relatives and friends live, the right *not* to migrate is of great importance.  For many of the homeless who are Native American, their attachment to the place where they now live is also rooted in a long standing tribal attachment to particular rivers and places, such as the Chehalis River.

> **5.** **Any Restriction or Burden Placed on the Exercise of the Fundamental Right to Travel Must Pass Strict Scrutiny in Order to Avoid Being Struck Down.**

In *Shapiro* the Supreme Court held that orders that restrict freedom of travel or limit where a person can live trigger strict scrutiny.  *See, e.g., Shapiro*, 394 U.S. at 634 ("in moving from State to State or to the District of Columbia appellees were exercising a constitutional right, and any classification which serves to penalize the exercise of that right, unless it is shown to be necessary to promote a *compelling* governmental interest, is unconstitutional.")[11]; *State v. Alphonse*, 142 Wn. App. 417, 439, 174 P.3d 684 (2008) ("courts apply strict scrutiny in

---

[11] While noting that the governments had to satisfy the much higher strict scrutiny standard, in *Shapiro* the Court concluded that the burden placed on the right to travel could not even meet the lower level rational basis standard: "[E]ven under traditional equal protection tests a classification of welfare applicants according to whether they have lived in the State for one year would seem irrational and unconstitutional. [FN omitted].  But of course, these traditional criteria do not apply in these cases.  Since the classification here touches on the fundamental right of interstate movement, its constitutionality must be judged by the stricter standard of whether it promotes a *compelling* state interest."  *Shapiro*, at 638.

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER – 18
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

reviewing a banishment order"); *Eggert*, 81 Wn.2d at 847 (the compelling state interest test is required by the penalty on the right to travel).

### 6. Banishment Orders Implicate the Right to Travel and Trigger Strict Scrutiny.

Any law or court order that prohibits a person from living in, or coming into, a specific city, county, or geographic area, functions as a banishment order. Courts subject such banishment orders to strict scrutiny and routinely strike them down when they are not narrowly tailored or not supported by a compelling governmental interest. Governmental officials may wish to banish a convicted criminal for reasons similar to the desire to exclude poor people. Criminals cause trouble and government officials would prefer that they be expelled from their jurisdiction so that whatever trouble they cause will be some other government's problem.

> An order banishing an individual from a large geographical area is bound to raise both societal and legal concerns. At a minimum, dumping convicts on a city, county or state neighbor is bound to raise public policy concerns. Banishment orders conjure memories from "the script of some old Grade-B cowboy movie where the sheriff tells the bad guy to 'get out of Dodge.'" At the most, banishment orders encroach on an individual's constitutional right to travel within a state. Because of its constitutional implications, we apply strict scrutiny in reviewing a banishment order. To survive such review, the order must be narrowly tailored to serve a compelling governmental interest.

*Schimelfenig*, 128 Wn. App. at 226 (citations omitted).

The defendant in *Schimelpfenig* was convicted of Murder 1 for killing a person inside her Hoquiam home. As part of his sentence, the defendant was banished from Grays Harbor County for the rest of his life. *Id*. at 225. The asserted purpose of the banishment order was to insure that the relatives of the murdered woman would never see the defendant and thus would never be reminded of him. *Id*. at 229. The Washington Court of Appeals held that the banishment order was not narrowly tailored to serve the asserted interest and violated his constitutional right to right to travel. *Id*. at 226. Significantly, the Court held noted that the defendant had lived with his family in Grays Harbor for his entire life and that banning him from residing in the county was therefore likely to heavily burden him and his family. *Id*. at

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING
ORDER – 19
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

230. The Court also noted there were less restrictive alternatives that made a county wide ban on residence unconstitutional.

Other courts have reached similar conclusions, striking down banishment orders as violative of the right to travel because they were not narrowly tailored or not supported by a compelling interest. *See, e.g., In re Matter of Martinez,* 2 Wn. App.2d 904, 413 P.3d 1043 (2018) (lifetime ban on being in Thurston County imposed on man convicted of child rape violated his constitutional right to travel because the restriction was not narrowly tailored to achieve purpose of insuring that he did not have any further contact with his victim); *State v. Alphonse,* 147 Wn. App. 891, 910-911, 197 P.3d 1211 (2008), *rev. denied* 166 Wn.2d 1011 (2009) (sentencing order banning defendant from the City of Everett held unconstitutional; even though there was a compelling state interest in protecting the safety of the defendant's victim, it violated right to travel because it was not narrowly tailored and less restrictive means were available to serve the State's interest ); *State v. Sims,* 152 Wn. App. 526, 216 P.3d 470 (2009) (sentencing order banishing defendant convicted of child molestation from Cowlitz County unconstitutional because not narrowly tailored); *State v. Franklin,* 604 N.W.2d 79, 83-84 (Minn. 2000) (order banishing defendant from Minneapolis held unconstitutional because defendant had substantial ties to the city and the order was not related to his crime of trespassing in a building located on the outskirts of the city); *People v. Beach,* 147 Cal. App.3d 612, 620-23 (Cal. Ct. App. 1983) (woman convicted of shooting an intruder banished from her community, held unconstitutional noting that it would have displaced woman from her home of 24 years).

**7.    As Applied to Homeless People and Taken as a Whole, Aberdeen's Anti-Homeless Ordinances Effectively Banish the Plaintiffs from the City. Therefore, Enforcement of These Laws Against the Plaintiffs Violates the Right to Travel.**

Effective May 2, 2019, the City of Aberdeen intends to banish everyone from the River Camp property.  Aberdeen's anti-camping law makes it unlawful to "camp" – to live – on

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER – 20
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

streets, sidewalks, parking lots, and on any publicly owned property.  Aberdeen's sidewalk law makes it a crime for everyone to obstruct sidewalks by placing obstacles on them.

For most people, these laws are not problematic.  But when considered all together they are unconstitutional *as applied to the homeless* because they have the ultimate effect of banishing them from the City of Aberdeen.  They have the effect of driving them out of the city; they prevent them from continuing to live where they have lived for years and sometimes for practically all their life.  *See, e.g., Decl. Allison* (34 years)*, ¶3; Decl. Francis,* ¶¶ 3 & 5 (continuously for past 5 years, camping at River Camp on and off since he was 16); *Decl. Hinkle & Vervalen,* ¶¶ 3, 5, & 6 (Hinkle, 18 years in Hoquiam and past 8 years at River Camp; Vervalen, 90% of his life in Hoquiam/Aberdeen area and past 8 years at River Camp);  *Decl. Micheau,* ¶¶ 3 (three different periods of living at River Camp since 2011 for total of 5-6 years).

Just as Boise's anti-camping law was unconstitutional *as applied* to the homeless, Aberdeen's configuration of laws is unconstitutional as applied to the homeless in this case. Just as States and cities cannot constitutionally fence out the poor and prevent them from moving *in* to their jurisdictions, they also cannot drive out the poor that currently reside in their jurisdictions.

### 8.   There is No Compelling Governmental Interest to be Served.

If the City's true goal was to protect the homeless people living at River Camp, "closure" of the River Camp property is certainly not the least restrictive means of achieving that goal.  If the City truly wished to ensure that this property was inhabitable, it could budget reasonable resources – such as public maintenance, regular sanitation service and outdoor lavatory service – to improve the property.   The City purchased the River Camp property in August of 2018 and has allowed the homeless to continue to live there since then, granting "registered" homeless people permits to continue to live there through May 1, 2019.  It cannot be that for all that time there was no compelling interest in evicting them, and that suddenly on May 1, 2019 a compelling interest in protecting them from living conditions that made the land

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER – 21
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

"unfit for human habitation" suddenly came into being for the first time.  Living conditions were poor, are poor and remain poor.  The notion that a compelling governmental interest in protecting the residents of River Camp from public health dangers was spontaneously generated in the month of April when the City Council took up the "closure" ordinance is not even remotely tenable.

**9.      There are Less Restrictive Alternatives.**

It is noteworthy that the City has been under a court order to provide garbage disposal services for the past four months and nothing prevents the City from continuing to provide those services.  *Decl. Lobsenz*, ¶ 5.  The availability of other alternative means of dealing with public health problems prevents the closure law from being narrowly tailored.

In the past the City has made much of the fact that one homeless person was injured[12] by a moving train in the spring of 2018.  Without in any way disputing the tragedy of that accident, the City grossly exaggerates the danger posed by moving trains.  Although train cars do occasionally move along the tracks, they generally go just a little faster than the speed of a normal walking pace and they virtually never exceed 10 mph.  *Decl. Campbell, ¶* 15.  It is very easy to avoid being hit by one of them.  As people like Reverend Monroe and Reverend Campbell attest, they have entered the property and visited the people living there scores of times and have never had a close call and never felt in danger of being hit by a train.  *Decl. Campbell*, ¶15; *Decl. Apryl Obi Boling, ¶* 5.   The one person who was injured "has a major mental illness," "often talks to 'people' who are not there," and who by her own admission was doing something "really stupid" when she was hurt.  *Decl. Campbell*, ¶¶ 13-14.  This woman, referred to by the pseudonym "Jane," told Reverend Campbell that she was "playing chicken" with someone else and was walking between parked train cars when the train began to move

---

[12] So far as Reverend Campbell knows, this incident is the only incident in the last 25 years in which a person has been injured by a train moving on the train tracks at River Camp.  *Decl. Campbell*, ¶16.

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING
ORDER – 22
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

and she was knocked down and run over. *Id.*, ¶13.   It is unknown whether this "other person" was a real person or a delusion. *Id.,* ¶14.[13]

**B.** **Aberdeen's Ordinances Violate Due Process and Amount to Cruel and Unusual Punishment Under the United States Constitution.**

      **1.** **Long Ago the Ninth Circuit Held that Banishment is an Unconstitutional Punishment.**

Over half a century ago, in a criminal case where the defendant was convicted of lying to immigration officials, the Ninth Circuit held that a sentence that included a deportation order was unconstitutional because it amounted to banishment:

> Defendant objected to the sentence.   The court having imposed a lawful imprisonment then suspended the sentence for six months upon the condition that the defendant depart from the United States.   It is not enough for the government to answer that such condition merely gave the defendant a "choice." For instance, if the condition were that the defendant must join a church, that would be an unconstitutional condition upon the sentence.   If, as the government contends, the defendant is not a citizen of the United States, his departure therefrom would leave him without any right to return to this country.   ***The condition is equivalent to a "banishment" from this country*** and from his wife and children, who will presumably remain here.   ***This is either a "cruel and unusual" punishment or a denial of due process of law.   Be it one or the other, the condition is unconstitutional.***

*Dear Wing Jung v. United States*, 312 F.2d 73, 75-76 (9th Cir. 1962) (emphasis added).

The *Wing* Court held that banishment was *either* cruel and unusual punishment or a violation of substantive due process.   Subsequent Supreme Court cases have clarified the dividing line between Eighth Amendment punishment claims and Due Process punishment claims.   "[U]nder the Due Process Clause, a [pretrial] detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).   "[T]he Government concededly may detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility *so long as those*

---

[13] Of course, if this type of danger was the overriding cause for concern, the City could guard against this sort of incident by building a fence between the property and the train tracks. *See Decl. Campbell*, ¶¶ 18-19 ("Fences would make it impossible for anyone to do what 'Jane' did.").

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER – 23
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

*conditions and restrictions do not amount to punishment*, or otherwise violate the Constitution." *Id.* at 536-37 (italics added).  There is "a distinction between punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may." *Id.* at 537.

> 2.   **Banishment as a Punishment Imposed After Conviction Violates the Eighth Amendment.**

In *Trop v. Dulles,* 356 U.S. 86 (1958) in a plurality opinion, four members of the Supreme Court held that imposing forfeiture of citizenship as a punishment for the crime of desertion violated the Eighth Amendment:

> We believe . . . that use of denationalization as a punishment is barred by the Eighth Amendment. There may be involved no physical mistreatment, no primitive torture. There is instead the total destruction of the individual's status in organized society. It is a form of punishment more primitive than torture, for it destroys for the individual the political existence that was centuries in the development. The punishment strips the citizen of his status in the national and international political community. His very existence is at the sufferance of the country in which he happens to find himself. While any one country may accord him some rights, and presumably as long as he remained in this country he would enjoy the limited rights of an alien, no country need do so because he is stateless.

*Trop*, at 101-02.  *Cf. Rutherford v. Blankenship*, 468 F.Supp. 1357, 1360 (W.D. Va. 1979) ("[T]he punishment by banishment to another state is prohibited by public policy.  [Citations].  Banishment has also been viewed as unconstitutional because it amounts to cruel and unusual punishment or is a denial of due process of law.").

Plaintiffs submit that when a city, such as Aberdeen, makes it unlawful for a person to live anywhere within that city, it imposes a punishment similar to forfeiture of citizenship.  It renders the person "cityless" rather than "stateless," but the effect is much the same.  It strips a person of membership in his local community.  It strips him of his political existence by preventing him from being a resident of the city, and thereby prevents him from participating as a voter in the community's selection of government officials.  Like denationalization, it turns a person out of his home and sets him adrift to attempt to find a new community that will suffer

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER – 24
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

his existence.  If a homeless person cannot "camp" – i.e., cannot *live* – in Aberdeen, he is forced to seek refuge elsewhere.  And if Aberdeen need not allow him to live on public property, then no other Washington city need allow him to do so either.  To paraphrase *Trop*, "[w]hile any one [city] may accord him some rights, . . . no [city] need do so because he is [cityless]."

### 3.   "Punishments" are Imposed in Both Criminal and Civil Proceedings.

"The notion of punishment, as we commonly understand it, cuts across the division between the civil and the criminal law . . . ."  *United States v. Halper*, 490 U.S. 435, 447-48 (1989).  The labels "criminal" and "civil" are not of paramount importance.  *Id.*  It is commonly understood that civil proceedings may advance punitive as well as remedial goals, and, conversely, that both punitive and remedial goals may be served by criminal penalties.  *Id.*

Punishment serves the twin goals of retribution and deterrence.  *Id.* at 448.  "[A] civil sanction that cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment" as far as courts are concerned.  *Id.* at 448.  Whether a sanction appears excessive in relation to its nonpunitive purpose is relevant to determination whether sanction is civil or criminal.  *Id.* at 449.

### 4.   Loss of citizenship is punishment even when imposed in a civil proceeding.

In *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 169 (1963) the Supreme Court considered the question whether forfeiture of citizenship was a "punishment," and if so whether it was constitutional.  Mendoza-Martinez, an American citizen was first convicted of the crime of leaving the United States for the purpose of evading military service and he was sentenced to prison.  After he finished serving his sentence, a warrant for his arrest was issued in a subsequent civil deportation proceeding.  Mendoza-Martinez challenged the law that stripped him of his citizenship on Eighth Amendment grounds and the Supreme Court agreed with him that the loss of citizenship was a punishment.  *Id.* at 165-66 ("Congress has plainly employed the sanction of deprivation of nationality as a punishment").  Because loss of citizenship was

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING
ORDER – 25
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

automatically imposed, the Court held that the imposition of this punishment violated the Due Process clause of the Fifth Amendment.

The Court devised a multi-factor test for ascertaining whether a sanction was a punishment, applied it to Mendoza-Martinez's loss of citizenship, and held that it fit the traditional notion of punishment: "The punitive nature of the sanction here is evident under the tests traditionally applied to determine whether an Act of Congress is penal or regulatory in character, even though in other cases this problem has been extremely difficult and elusive of solution." *Id.* at 168.

5.   ***Martin v. Boise* Holds that Making it a Crime to Live in a City is Cruel and Unusual Punishment**.

The facts of *Martin* are strikingly similar to the facts of this case. Like Aberdeen, the City of Boise used two ordinances to prohibit homeless people from lawfully living in the city. Like Aberdeen, Boise had a "Camping Ordinance" that "ma[de] it a misdemeanor to use 'any of the streets, sidewalks, parks or public places as a camping place at any time.'" "The Camping Ordinance define[d] "camping" as 'the use of public property as a temporary or permanent place of dwelling, lodging, or residence.'" *Martin*, 902 F.3d at 1035.   In addition, Boise had a Disorderly Conduct ordinance that prohibited "[o]ccupying, lodging, or sleeping in any building, structure, or public place, whether public or private … without the permission of the owner or person entitled to possession or in control thereof." *Id.* Six current or former homeless residents of Boise challenged the constitutionality of these laws as applied to them. The district court granted summary judgment to the defendant City but the Ninth Circuit reversed and remanded the case for further proceedings on the Plaintiffs' claims for prospective injunctive relief against enforcement of these ordinances. *Id.* at 1049.

The essence of *Martin* is the Court's holding that the Eighth Amendment places some substantive limits on what kind of conduct can be made criminal. The *Martin* Court noted that the Cruel and Unusual Punishments Clause "circumscribes the criminal process in three ways."

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER – 26
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

*Id.* at 1046.  First, it limits the type of punishment that Government may impose; second, it prescribes punishment "grossly disproportionate" to the severity of the crime; and third it places substantive limits on what the government may criminalize.  *Id.*  In *Martin* the Court held: "It is the third limitation that is pertinent here."  *Id.*

*Martin* holds that making it a crime to engage in conduct which is simply unavoidable is prohibited by the Eighth Amendment:

> "Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold."  *Robinson v. California*, 370 U.S. 660, 667, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

*Martin*, 902 F.3d at 1046.

As *Martin* explains, the constitutional defect in *Robinson* was that the law in that case made it unlawful to have a "status" that was essentially unavoidable in the same way that having a cold was unavoidable:

> *Robinson*, the seminal case in this branch of Eighth Amendment jurisprudence, held that a California statute that "ma[de] the 'status' of narcotics addiction a criminal offense" invalid under the Cruel and Unusual Punishments Clause.  The California law at issue in *Robinson* was "not one which punishe[d] a person for the use of narcotics, for their purchase, sale, or possession, or for antisocial or disorderly behavior resulting from their administration"; it punished addiction itself. Recognizing narcotics addiction as an illness or disease – "apparently an illness may be contracted innocently or involuntarily" – and observing that a "law which made a criminal offense of . . . a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment." *Robinson* held the challenged statute a violation of the Eighth Amendment.

*Martin*, 902 F.3d at 1047 [Citations omitted].

The principle underlying *Robinson* was fleshed out in the later case of *Powell v. Texas*, 392 U.S. 514 (1968).  *Powell* concerned the constitutionality of a Texas law making public drunkenness a criminal offense.  Justice Marshall wrote an opinion for a four justice plurality. These four justices said the Texas law was different because it did not punish status.  Instead, these justices said the Texas law punished conduct – the conduct of appearing in public while drunk.  A fifth justice, Justice White, concurred in the result reached by the Marshall plurality,

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER – 27
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

and four justices dissented.  The *Martin* decision analyzes the White opinion, recognizes that Justice White's opinion is the law of the *Powell* case, and correctly concludes that homelessness, like alcoholism or drug addiction, is a status that government may not punish without transgressing the limits set by the Eighth Amendment.  Justice White concluded that a homeless alcoholic could not avoid being publicly drunk, and therefore as applied to homeless publicly drunken people the Texas law would be unconstitutional:

> Notably, Justice White noted that ***many chronic alcoholics are also homeless,*** and that for those individuals, public drunkenness may be unavoidable as a practical matter.  "For all practical purposes ***the public streets may be home for these unfortunates, not because their disease compels them to be there, but because, drunk or sober, they have no place else to go and no place else to be when they are drinking.***  For some of these alcoholics I would think a showing could be made that resisting drunkenness is impossible and that avoiding public places when intoxicated is also impossible.  ***As applied to them this statute is in effect a law which bans a single act for which they cannot be convicted under the Eighth Amendment*** – the act of getting drunk. *Id.* at 551, 88 S.Ct. 2145 (White, J., concurring in the judgment).
>
> The four dissenting judges adopted a position consistent with that taken by Justice White: that under *Robinson*, "criminal penalties may not be inflicted upon a person for being in a condition he is powerless to change," and that the defendant, "once intoxicated … could not prevent himself from appearing in public places."  *Id.* at 567, 88 S.Ct. 2145 (Fortas, J., dissenting).  Thus, five justices gleaned from *Robinson* the principle "that the Eighth Amendment ***prohibits the state from punishing an involuntary act or condition if it is the unavoidable consequence of one's status or being.***"

*Martin*, 902 F.3d at 1047-48 (some citations omitted) (emphasis added).

Applying this principle to the homeless Plaintiffs of Boise, the Ninth Circuit concluded that punishing people for "camping" or for sleeping or sitting in public places violated the Eighth Amendment because sleeping, sitting and "camping" (living) were unavoidable consequences of being a human being:

> Th[e] [*Robinson*] principle compels the conclusion that the Eighth Amendment prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter.  As *Jones [v. City of Los Angeles*, 444 F.3d 1118 (9thCir. 2006), *vacated*, 505 F.3d 1006 (9th Cir. 2007)] reasoned, ***"[w]hether sitting, lying and sleeping are***

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING
ORDER – 28
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

*defined as acts or conditions, they are universal and unavoidable consequences of being human."* Moreover, any "conduct at issue here is involuntary and inseparable from status – they are one and the same given that *human beings are biologically compelled to rest, whether by sitting, lying or sleeping."* As a result, just as the state may not criminalize the state of being "homeless in public places," *the state may not "criminalize conduct that is an unavoidable consequence of being homeless – namely sitting, lying, or sleeping on the streets."*

*Martin*, 903 F.3d at 1048 (emphasis added) (some citations omitted).

Like Boise, Aberdeen makes it unlawful to live – to "camp" – in public places. In an attempt to evade the constitutional holding in *Martin*, in February of this year Aberdeen amended its anti-camping ordinance so that a violation of it no longer constituted a "crime" and was henceforth merely a civil infraction. Aberdeen made this change (as many cities throughout the Ninth Circuit did to its anti-camping law) precisely because it wanted to avoid a court finding that it was violating the Eighth Amendment rights of the homeless, but it wanted to continue to make it illegal for the homeless to camp – to live – on public property. Aberdeen will argue, as many cities throughout the Ninth Circuit are now doing – that this demotion of the degree of unlawfulness insulates its anti-camping ordinance from the scope of the *Martin* decision. Aberdeen will argue to this Court that it is constitutionally permissible to punish the homeless for being homeless so long as that punishment is labeled "civil". But this contention conflicts with cases like *Halper, Mendoza-Martin*, and *In re Winship*, 397 U.S. 358 (1970). As noted long ago, governments cannot escape the requirements of the constitution by relabeling punishments as civil:

> [C]ourts and legislators have shrunk back from labeling these laws as 'criminal' and have preferred to call them 'civil.' This, in part, was to prevent the full application to juvenile court cases of the Bill of Rights safeguards, including notice as provided in the Sixth Amendment, the right to counsel guaranteed by the Sixth, the right against self incrimination guaranteed by the Fifth, and the right to confrontation guaranteed by the Sixth.

*In re Gault*, 387 U.S. 1, 59-60 (1967) (Black, J. concurring).

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER – 29
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

**6.** **The Eighth Amendment Prohibits Cruel and Unusual "Punishments."  It Applies to All Types of Punishment and Makes no Distinction Between "Civil" and "Criminal" Punishments.**

The Eighth Amendment places constitutional restraints on "punishments."  It does *not* limit its prohibition against cruel and unusual punishments to punishments imposed in cases that are labeled "criminal."  But the United States Supreme Court has explicitly rejected the contention that the Eighth Amendment does not apply to civil cases:

> [The United States] further suggests that the Eighth Amendment cannot apply to a civil proceeding unless that proceeding is so punitive that it must be considered criminal under *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), and *United States v. Ward*, 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980). Brief for United States 26–27. We disagree.

> Some provisions of the Bill of Rights are expressly limited to criminal cases. The Fifth Amendment's Self–Incrimination Clause, for example, provides: "No person ... shall be compelled in any criminal case to be a witness against himself." The protections provided by the Sixth Amendment are explicitly confined to "criminal prosecutions." [Citation]. ***The text of the Eighth Amendment includes no similar limitation.***

> ***Nor does the history of the Eighth Amendment require such a limitation*** . . .

*Austin v. United States*, 509 U.S. 602, 608 (1993) (emphasis added).

As noted above, "[t]he notion of punishment, as we commonly understand it, cuts across the division between the civil and the criminal law . . . ."  *United States v. Halper*, 490 U.S. 435, 447-48 (1989).  Enforcement proceedings may be labeled "civil," but if Government imposes a significant monetary fine such proceedings are still subject to the Fifth Amendment Double Jeopardy prohibition against multiple "punishment." *Id.* at 452.  Deportation proceedings are "civil," and yet deportation from this country is a type of punishment which is subject to the Sixth Amendment requirements of notice, confrontation, compulsory process, and trial by jury. *Mendoza-Martin*, 372 U.S. at 164.  Juvenile delinquency proceedings may be denominated "civil," but that does not change the fact that they are still subject to the same constitutional due process requirement that guilt be proved beyond a reasonable doubt, and to the same Fifth and Sixth Amendment requirements that they be provided with the assistance of

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER – 30
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

1  counsel and afforded the privilege against self-incrimination.  See, e.g., *In re Winship*, 397 U.S.

2  358, 365 (1970); *In re Gault*, 387 U.S. 1, 49 (1967)

3      The City's position is that foregoing any punishment of imprisonment by reclassifying

4  unlawful camping as an infraction simply removes the anti-camping ordinance from the scope

5  of the Eighth Amendment.  According to the City, since unlawful camping is now – after the

6  February amendments – only punishable by a monetary fine, the Eighth Amendment

7  prohibition against cruel and unusual punishments is simply inapplicable.  This argument

8  simply ignores cases such as *Bajakajian*, where a monetary forfeiture was held to violate the

9  Eighth Amendment prohibition against excessive fines, and *Halper*, where the Court

10  recognized that a monetary fine could violate the Fifth Amendment prohibition against multiple

11  punishment.

12      The absurdity of the Government's position is easily illustrated.  Suppose a city

13  ordinance made unlawful camping punishable by a minimum fine of $10,000.  As applied to a

14  homeless person inured in poverty such a monetary fine would be grossly disproportionate in

15  the same way that the forfeiture in *Bajakajian v. United States,* 524 U.S. 321 (1998) was grossly

16  disproportionate. In that case the Court held that "[t]he touchstone of the constitutional inquiry"

17  for purposes of the Eighth Amendment Excessive Fines Clause is "the principle of

18  proportionality."  *Id*. at 334.  Imposing a $10,000 fine upon a person who is homeless because

19  of his poverty would violate the Eighth Amendment because it would be unconstitutionally

20  excessive, and because it would be cruel.  Such a fine would not be immune from Eighth

21  Amendment review because it was a mere "fine" as opposed to a punishment of imprisonment.

22      Moreover, even if the monetary fine that a homeless person might have to pay did not

23  exceed a maximum of $2, it would *still be a punishment and thus it would still be subject to the*

24  *Eighth Amendment*.[14]  In the case of the homeless, it is not the size of the fine imposed that

25      [14] In *Austin* the Government sought forfeiture of the defendant's mobile home.  Austin was convicted of selling

26  cocaine and he conducted his drug dealing from his home and kept the drugs in that home.  Whenever government
seeks forfeiture of a person's *home,* the possibility that forfeiture will render the person homeless is a highly

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING
ORDER – 31
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

violates the Eighth Amendment; it is the fact that in Aberdeen they are subject to punishment for their status – for being homeless. *Cf. United States v. 461 Shelby Cty. Rd.*, 857 F. Supp. 935, 938 (N.D. Ala. 1994) (forfeiture of residential home as punishment for drug offense would be constitutionally excessive).[15]   It is the fact that they are human beings that creates for them the unavoidable consequence of having to sit, lie down, rest, sleep, "camp," and live somewhere.   Since those consequences of being a human being are unavoidable, the Eighth Amendment prohibits Aberdeen from imposing *any* degree of punishment upon them for that status.

### 7.   The Aberdeen City Council has Imposed a Form of Punishment upon the Homeless by Making it Unlawful for Them to Live in Aberdeen.

To return to the Supreme Court's example in *Robinson*, just as "even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold," so would a monetary fine no matter how small it was.   For a homeless person with no place else to go, "[e]ven [a one dollar fine] would be cruel and unusual punishment for the 'crime" of having to camp or sleep on public property, because that would constitute punishment for the status of being homeless.   Punishing people for being homeless, like punishing them for being an addict, or being infected with AIDS, or with a common cold, is simply unconstitutional.   As Justice Black said in *Gault*, cities and States cannot avoid the Constitution by relabeling a proceeding and simply choosing to call it a "civil" proceeding or a "civil" penalty.

---

significant factor weighing in favor of the conclusion that such a forfeiture would violate the Eighth Amendment. *See, e.g., von Hofe v. United States*, 492 F.3d 175, 188-89 (2d Cir. 2007) (a forfeiture that would "amount to eviction" from family home is an excessive fine); *United States v. One Single Family Residence*, 13 F.3d 1493, 1498 (11th Cir. 1994) (notwithstanding "the fact that Emilio Delio used his home for a gambling operation" the forfeiture of his home was "a disproportionate penalty"); *State v. Real Property at 633 East 640 North*, 2000 UT 17, 994 P.2d 1254, 1257-59 (Utah 2000) (because it is an especially onerous punishment, forfeiture of the defendant's home, which was used for drug trafficking, violated the Eighth Amendment Excessive Fines Clause).

[15] In *Shelby County Rd.* the District Court relied on the Eighth Amendment requirement of proportionality as a justification for its decision *not* to order forfeiture of the convicted defendant's home,  noting that it would be unconstitutional to render him homeless:  "[I]f the property to be forfeited is the offender's homestead, property historically given a high degree of protection. It is much more likely that the taking of the homeplace would constitute an excessive fine than the taking of other property of equal value. *Society already has more homeless people than it wants or can take care of, and this court is wary of adding the Brashers to the list of the homeless*." ... 857 F. Supp. at 938 (emphasis added).

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER – 32
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

When deciding whether banishment from a town is a punishment, a court looks at the *Mendoza-Martinez* factors. Those factors include whether banishment has historically been regarded as a punishment; whether its operation serves the traditional aims of retribution or deterrence; and whether it is excessive in relation to the purposes underlying the offense (or in this case the infraction) committed. Historically, banishment has been considered a punishment. *People v. Baum*, 251 Mich. 187, 188, 231 N.W. 95 (Mich. 1930) ("banishment and deportation to criminal colonies was a common method of punishment in England."); *Rutherford*, 468 F.Supp. at 1360 ("Banishment as a punishment has existed throughout the world since ancient times.") In *Baum* the Michigan Supreme Court held that a sentence that banished the defendant from the State for a period of five years violated both the Fourteenth Amendment due process clause and the Michigan Constitution. *Id.* In a passage equally pertinent to the type of city versus city conflicts that are now arising as one municipality tries to make its homeless migrate to another city, the Michigan Court noted that banishment from one State to another provoked similar conflicts:

> To permit one state to dump its convict criminals into another would entitle the state believing itself injured thereby to exercise its police and military power, in the interest of its own peace, safety and welfare, to repel such an invasion. It would tend to incite dissension, provoke retaliation, and disturb that fundamental equality of political rights among the several states . . . .

*Baum*, at 189.

Forcing the homeless to leave the City does serve the purpose of deterring homeless people from living in Aberdeen; and banishment is excessive in relation to the "infraction" of "camping" – i.e., living upon – publicly owned land.

**C.**   **Aberdeen's Ordinances, As Applied to the Homeless, Violate the Cruel Punishment Prohibition set forth in Washington Constitution, art. 1, §14.**

The Washington State Constitution contains a counterpart to the Eighth Amendment Cruel and Unusual Punishments Clause. But unlike the Eighth Amendment, there is no requirement that a punishment be "unusual"; instead, it provides that all "cruel" punishments

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING
ORDER – 33
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

are prohibited.  The Washington Supreme Court has not consistently interpreted its Cruel Punishment Clause to provide *greater* protection that the Eighth Amendment.  Recently, for example, the state supreme court struck down Washington State's death penalty statute because it violated article 1, §14.  *State v. Gregory*, 192 Wn.2d 1, 15-16, 427 P.3d 621 (2018).  *See also State v. Bassett*, 192 Wn.2d 67, 77-80, 428 P.3d 343 (2018) (art. I, §14 provides greater protection for juvenile defendants than the Eighth Amendment does).

Plaintiffs submit that it is clear that Aberdeen's threatened eviction of the homeless residents of River Camp would violate the Eighth Amendment.  Thus, in this case there may never be any need to resolve the separate legal question of whether Aberdeen's proposed action would violate art. 1, §14.  If it did become necessary or desirable to answer that question, however, it is clear that this Court would have to certify that question to the Washington Supreme Court, since at present Washington state case law does not directly address this question.

**D.**     **Aberdeen's Ordinances, As Applied to the Homeless, Would Violate the State and Federal Constitutional Guarantees of Freedom of Association.**

Like the right of privacy, the right of free association is an implied right under the constitution. Principally, this right has been conceived as protecting associations entered into for purposes of engaging in activities protected under the First Amendment.  *See, e.g., NAACP v. Alabama ex rel. Patterson, 357 U.S. 449 (1958).*  More recently, the United States Supreme Court has recognized that

> "implicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."  This right is crucial in preventing the majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas.

*Boys Scouts of America v. Dale*, 530 U.S. 640, 647-48 (2000) (*quoting Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)).  Oftentimes, the Washington courts have noted that

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER – 34
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

freedom of association is closely tied with freedom of movement.  *See, e.g., State v. Kinzy*, 141 Wn.2d 373, 391-92 (2000).

Generally speaking, the right to freedom of association under the First Amendment carries two distinct meanings in federal constitutional jurisprudence.  First, freedom of association concerns the "right to associate for the purpose of engaging in those activities protected by the First Amendment — speech, assembly, petition for the redress of grievances, and the exercise of religion."  *Roberts*, 458 U.S at 618.  Second, the Supreme Court has also "concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme."  *Id.* at 617-18.  The "personal affiliations" that warrant such protection are "those that attend the creation and sustenance of a family," including "cohabitation with one's relatives."  *Id.* at 619.

The City of Aberdeen's anti-homeless ordinances impinge on both aspects of the right to associate.  First, homeless persons have too little access to the political process within their home community.  To banish someone is to unconstitutionally deprive that individual of the ability to affect the political process in the geographical area in which her speech would be most relevant, and by extension, "indispensable to the discovery and spread of political truth."  *FCC v. League of Women Voters*, 468 U.S. 364, 383 (1984).  Banishment allows a government to control group associations and the attendant rights thereto; and banishment unconstitutionally separates (and alienates) government from the governed.

Second, when examining the "liberty" interest that is protected by the Due Process Clause of the Fourteenth Amendment, the Supreme Court has set forth heightened protections for familial and intimate relationships.  For instance, the Court held unconstitutional an ordinance that defined "family" in such a way as to prevent a grandmother from living with her grandson.  *See Moore v. City of East Cleveland*, 431 U.S. 494, 496-98 (1977).  In *Moore*, a

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING
ORDER – 35
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

plurality of the Court deemed the ordinance to be an "intrusive regulation of the family" that, in particular, "intrudes on choices concerning family living arrangements." *Id.* at 499.

If strictly enforced, Aberdeen's anti-homeless ordinances will force Plaintiffs to relocate and thereby impede their relationships with family and friends. For example, these ordinances will impair Apryl Obi Boling's ability to associate with the several relatives who are currently residing at the River Camp property.

## VIII.   THE CRITERIA FOR A TEMPORARY RESTRAINING ORDER ARE SATISFIED IN THIS CASE.

"The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction." *Gonzalez v. Arizona*, 435 F.Supp.2d 997, 999 (D. Arizona 2006); *Lockheed Missile and Space Co., v. Hughes Aircraft*, 887 F.Supp. 1320, 1323 (N.D. Cal. 1995); *United States v. Washington*, at *1, 2017 WL 1064460 (W.D. Wash.). For purposes of the present motion, therefore, this Court must look to those criteria.

"To obtain a preliminary injunction, the moving party must establish that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest." *Idaho v. Coeur D'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015). Alternatively, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

"These two alternatives represent 'extremes of a single continuum' rather than two separate tests. Thus, the greater the relative hardship to [a plaintiff] the less probability of success must be shown." *Walczak v. EPL, Prolong, Inc.,* 198 F.3d 725, 731 (9th Cir. 1999) (citation omitted).

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER – 36
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

**A.  Likelihood of Success**

Plaintiffs need not prove their case in full; they need only demonstrate that they have a likelihood of success on the merits or that they have raised questions serious enough to require litigation. *University of Texas v Camenisch,* 451 U.S. 390, 394-95 (1981).  Here, they have clearly done that by demonstrating that the City of Aberdeen has enacted a series of anti-homeless ordinances which, when enforced, will deprive Plaintiffs of their rights under the Eighth and Fourteenth Amendments.

Plaintiffs recognize that the City of Aberdeen has an interest in seeking to further public safety.  *See, e.g., Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 376 (1997).  Yet the City cannot make a persuasive claim that its actions with respect to the homeless population are "narrowly tailored to accomplish" that interest.  *See International Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1067 (9th Cir. 2011).  As noted by Reverend Campbell, it would be quite simple to put up fences that would prevent pedestrians from getting near the train cars.  There is already some fencing along one side of the railroad tracks, and there is "no apparent reason why a fence could not be built on the downtown (State Street/Heron Street) side of the railroad tracks." *Decl. Campbell*, ¶19.  A fence would prevent another mentally disturbed person like "Jane" from doing something that even Jane admits was "really stupid" and getting hurt by a moving train car.  *Id.*

To be clear, this is not a case where the City is intending to protect the homeless persons within its community.  In fact, the City has acknowledged that it will not offer adequate shelter options for any of the homeless persons who will be forced out of the River Camp.  *Cf. Drake v. County of Sonoma*, 304 F.Supp.3d 856, 757-58 (N.D. Cal. 2018).

**B.  Irreparable Harm**

The underlying purpose of a TRO is to preserve the status quo and prevent irreparable harm before a preliminary injunction hearing may be held.  *See, e.g., Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers,* 415 U.S. 423, 439 (1974); *Reno Air Racing*

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING
ORDER – 37
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

*Ass'n v. McCord*, 452 F.3d 1126, 1130-31 (9th Cir. 2006). It is well established that the deprivation of constitutional rights "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Enforcement of the City of Aberdeen's anti-homeless ordinances will cause these Plaintiffs irreparable harm. First, it is undisputed that if they are forced off the River Camp property the homeless people currently living there will have nowhere else to go. *See*, *e.g.*, *Declarations of Aitken*, ¶¶ 20-22; *Hinkle & Vervalen*, ¶¶ 17-18; and *Micheau*, ¶¶ 16-17. If evicted from River Camp, not only will they be forced to pack up and leave the only "home" they have, they also will be forced to move out of the City of Aberdeen.

At the City Council Meeting of April 10, 2019, one resident of River Camp told the City Council that she has been trying to find housing but her only source of income is a monthly Social Security disability payment which is not enough to pay for rent and she has been unable to qualify for housing assistance. Denise Trevillo told the Councilmembers that if forced to leave River Camp she would end up living on the streets:

> I don't know who gives you your information but there's a lot of people that don't have anywhere to go that have tried to follow all your rules, uhm, and still are struggling and don't have the proper assistance that you guys obviously think that is out there. Uhm, I, myself, ***I receive Social Security, I'm disabled, uhm, I'm 50 years old, uhm, and I don't qualify for a lot of the programs at CAP*** because of that. Okay, well, I don't know how many of you can live on $750 a month, but that's what I live on. And I have me, uh, and a partner and uh I just want to say- I mean- *we don't have anywhere to go, so if we have to leave May 1st, where-where are we gonna go? We're gonna go to the streets and it's gonna cause a lot more problems.*

*Declaration of Toni Nickel*, ¶ 2. (*emphasis added*).

At that same meeting, City Councilmember James Cook acknowledged the truth of the statement that River Camp residents had "nowhere else to go":

> **James Cook:** This circumstance is not isolated here on the river only. This is a national problem. This is a state problem. It's ongoing all over.
> *(Audience rumbling)*
> **Tawni Andrews:** Allow him to talk

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING
ORDER – 38
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

**James Cook:** Uh, my point being... uhhhh...the same thing comes up in "where do they go?"

*Declaration of Toni Nickel*, ¶ 3.

Mayor Larson has acknowledged that there is nowhere else for the homeless to go but asserts that due to lack of funding there is nothing the City can do about that. The Mayor has told Reverend Monroe, "[T]he City cannot provide solutions to the homelessness problem but can only deal with 'the symptoms.'" *Decl. Monroe*, ¶ 36.

> The Mayor says that a negative impact on businesses located in downtown Aberdeen is one of the "symptoms" of homelessness in Aberdeen.

> The *Daily World* newspaper quoted the Mayor as saying this: "Because of the lack of funding and how the problem has been exacerbated in the past 10 years, we're in a situation where we don't provide the solutions, but we're responsible for addressing the symptom." (See http://www.thedailyworld.com/news/diverse-crowd-packs-homelessness-workshop-in-aberdeen/.

*Decl. Monroe*, ¶¶ 37-38.

In sum, Plaintiffs have shown that they will suffer irreparable harm if the City is not enjoined from enforcing the eviction ordinance that will become law on May 8, 2019 when it has its third and final reading before the City Council.

**C.   Public interest in preventing cruel punishments, interference with the right to travel and interference with the right of freedom of association.**

While the public has an interest in safe neighborhoods, it is also "always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). A TRO is necessary and appropriate because the public does not have a legitimate interest in a "homeless free" community. This Court should guard against this type of NIMBYism and fear of homeless population.

While the City's "closure" law purports to be concerned about dangers "to the public" posed by the condition of the land at River Camp, this concern is transparently specious because "the public" virtually never goes onto that land. *Decl. Monroe*, ¶ 17. Except for a handful of social workers, drug counselors and clergy who occasionally visit the homeless, and the

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER – 39
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

sanitation workers who have sporadically been picking up garbage and emptying dumpsters, no one from the public goes onto the land at River Camp. *Decl. Monroe*, ¶¶ 15, 20, 21.  There is no reason to go there because there are no streets that penetrate it and no businesses or conventional homes there.  *Id.*

There are no public interests in enforcing the immediate eviction of Plaintiffs which could outweigh the public interest in vindicating the constitutional principles at issue in this lawsuit.

**D.** **Balance of equities.**

The court must identify the possible harm caused by issuing the temporary injunction against the possibility of harm caused by not issuing it in order to determine which way the balance of the equities tips.  *See, e.g., University of Hawaii Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1108-09 (9th Cir. 1999); *Armstrong v. Marurak*, 94 F.3d 566, 568 (9th Cir. 1996).

**1.** **Without a TRO Plaintiffs Will be Forced to Either Break the Law or Leave Aberdeen.**

Absent a TRO, Plaintiffs will not have a place to live and their mere existence within the City limits will subject them to arrest and both criminal and civil prosecution.  They will be forced to either leave the City or break the law.

**2.** **No Appreciable Harm to the Government Will Ensue if a TRO is Granted.**

By contrast, the City cannot seriously claim that the imposition of a TRO will cause it significant harm.  It is undisputed that homeless persons have been living at the River Camp – or what was formerly known as "Hobo Beach" – for decades.  Then, even after the City purchased this thin strip of land, homeless persons were granted permits to live on that property for many months.  The City has a strong desire to force all homeless persons to move out of town.  But it cannot demonstrate that their continued habitation at the River Camp will cause the City any appreciable harm.[16]

---

[16] Notably, the City is not currently intending to use the River Camp property for any other public purpose.

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER – 40
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

The only people occupying River Camp are the homeless who are living there.  And they are there because they had nowhere else to go.  At the Aberdeen City Council meeting of April 10, some of the homeless residents of River Camp spoke during the public comment section of the meeting and they told the City Council members that if they were forced to move from River Camp they had nowhere to go.  No member of the City Council disagreed with those statements.  On the contrary, some of City Council members expressed regret or offered their sympathy for their plight, but they did not even imply that there was a place within the City where they could legally pitch a tent and go to sleep.

Plaintiffs do not pose any danger to the City, and whatever legitimate interests that the City might have can easily be met by less intrusive means.  At this juncture, the balance of equities tip decidedly in favor of the Plaintiffs.

## IX.    CONCLUSION

For all these reasons, and in the interests of justice, this Court should grant a temporary restraining order or a preliminary injunction that enjoins the City of Aberdeen from enforcing its anti-homeless ordinances.  Specifically, the City should be enjoined from enforcing Resolution 19-5; the homeless people residing at River Camp should be permitted to continue to live there pending the ultimate resolution of this case.

DATED this 29th day of April, 2019.

_s/ James E. Lobsenz_
James E. Lobsenz WSBA No. 8787
CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104
Phone:  (206) 622-8020
Facsimile:  (206) 467-8215

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING
ORDER – 41
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

1

*s/ Todd Maybrown*
Todd Maybrown WSBA #18557
ALLEN HANSEN MAYBROWN &
OFFENBECHER
600 University Street Suite 3020
Seattle, WA 98101
Phone:  (206) 447-9681

Attorneys for Plaintiffs

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING
ORDER – 42
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

1

2

## CERTIFICATE OF SERVICE

3

4

I hereby certify that on this 29th day of April, 2019, I electronically filed the foregoing **PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

5

6

**Attorneys for Defendant City of Aberdeen**

7

M. Patrice Kent
CITY OF ABERDEEN
200 E Market St
Aberdeen WA  98520
Tel: (360) 537-3231
pkent@aberdeenwa.gov

8

9

10

11

John E. Justice, WSBA #23042
Jeffrey S. Myers, WSBA #16390
LAW, LYMAN, DANIEL, KAMERRER & BOGDANOVICH, P.S.
P.O. Box 11880,
Olympia,WA 98508
Phone: (360) 754-3480
jjustice@lldkb.com
jmyers@lldkb.com

12

13

14

15

16

DATED this 29th day of April, 2019.

17

_s/ Deborah A. Groth_

18

Legal Assistant

19

20

21

22

23

24

25

26

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING
ORDER – 43
(NO. 3:19-cv-05322-RBL)
DOE002-0001 5762203

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020