HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ELIZABETH AITKEN, et al.,<br><br>            Plaintiff,<br>v.<br><br>CITY OF ABERDEEN, a municipal government,<br><br>            Defendant. | CASE NO. 3:19-cv-05322-RBL<br><br>ORDER ON PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER<br><br>DKT. ## 11 & 43 |

## INTRODUCTION

THIS MATTER is before the Court on Plaintiffs' Renewed Motion for Temporary Restraining Order. Dkt. ## 11 & 43. For the past several years, much of Aberdeen's homeless population has resided on a narrow strip of land between a train yard and the Chehalis River. That land, known as "River Camp," was recently purchased by the City of Aberdeen, which now wants to remove the homeless occupants. Around the same time, the City amended its municipal code to make camping either civilly or criminally prohibited on public property throughout Aberdeen. Plaintiffs, who are members of or associated with Aberdeen's homeless community, have sued to enjoin the River Camp eviction and enforcement of the City's camping-related

ordinances. Plaintiffs argue that the ordinances are collectively unconstitutional because they make homelessness illegal in Aberdeen.

For the following reasons, Plaintiffs' Motion is DENIED in part and GRANTED in part.

**BACKGROUND**

**1.  River Camp**

River Camp is a piece of undeveloped land in Aberdeen occupied by about 100 homeless individuals, several of whom are Plaintiffs in this case. The property is bordered to the south by the Chehalis river and to the north by a rail yard and is about 200 feet wide by 1200 feet long. Unless someone traverses the rail yard, which is always occupied by train cars, there are only two entrances to River Camp accessible for pedestrians only. According to Plaintiffs, homeless encampments have existed in River Camp for the past several decades. Plaintiffs Hinkle and Vervalen have lived there for over eight years.

But while River Camp is home to some, it also poses health and safety problems for its occupants and the community. Police are often called to the property to address theft, assault, sexual assault, and controlled-substance use. River Camp's isolated location also makes it an ideal place for those wishing to take advantage of its vulnerable residents and for criminal suspects seeking refuge. With its thick vegetation, holes filled with human waste, discarded needles, and numerous tents, police officers face challenging obstacles when pursuing individuals into the camp. These aspects of River Camp also slow down emergency responders and otherwise make the property unsanitary and dangerous for its occupants. Indeed, it is important that first responders be able to access River Camp because its residents often have fires near their flammable shelters, which have been incinerated in the past. Finally, River Camp's location adjacent to the rail yard poses additional safety risks. The rail company has

reported damage to its tracks from vehicles crossing to access the camp and one homeless resident had her legs severed by a train while attempting to crawl under it.

Likely aiming to address these problems, the City purchased the River Camp property in August of 2018 for $295,000. In September, the City initiated a permitting process that required residents of River Camp to register in order to stay there. In April of 2019, the City announced a proposed ordinance that would prohibit access to the River Camp property altogether.

**2.    The City's Ordinances**

Four ordinances are at issue in this case. The first is Ordinance No. 19-5, or the "Eviction Ordinance." Its effect will be to evict the occupants of River Camp and prohibit all public access to the property once enacted. Dkt. #1, Appendix D, at 2-3. The ordinance cites the dangerous adjacent rail yard, sanitation concerns, lack of police and medical access, and zoning violations as reasons for the eviction. *Id*. at 2. The Eviction Ordinance was scheduled for final approval on May 8 but has been delayed due to this lawsuit.

The second ordinance is Aberdeen Municipal Code § 12.46, or the "Anti-Camping Ordinance," which imposes civil liability for unlawful camping. Section 12.46.040 was expanded in February of 2019 to make "camp[ing] or us[ing] camp paraphernalia" illegal in basically all public places in Aberdeen, including public parks, streets, sidewalks, and "[a]ny other publicly owned parking lot or publicly owned property, improved or unimproved." The ordinance "shall be enforced at all times" except "when there is no available overnight shelter for individuals or family units experiencing homelessness on the date that camping occurs," in which case camping is allowed on "[p]ortions of any street right-of-way that are not expressly reserved for vehicular or pedestrian travel." AMC § 12.46.045. Violations of the Anti-Camping Ordinance are Class 4 civil infractions resulting in fines of up to $25.00. AMC § 12.46.050.

The third ordinance is Aberdeen Municipal Code § 12.41, or the "Sit-Lie Ordinance." Under § 12.41.010, "No person shall sit or lie down upon a public sidewalk, or upon a blanket, chair, stool or other object placed upon a public sidewalk within the city of Aberdeen Downtown Parking and Business Improvement District as defined in Chapter 10.20 during the hours of 6:00 a.m. and 11:00 p.m." Violation is a Class 3 civil infraction that can lead to a fine of $50 plus statutory assessments. AMC § 12.41.020. Violators may be required to perform community service if they are unable to pay. *Id*. In addition, failure to appear in court or sign a notice of civil infraction amounts to a criminal misdemeanor. *Id*.

The fourth and final ordinance is Aberdeen Municipal Code § 12.44, or the "Sidewalk Law," which makes it a criminal misdemeanor to obstruct sidewalks. Under Section 12.44.040, "No person shall place or cause to be placed or keep or suffer to remain, any article in any street or on any sidewalk of the city, so as to obstruct the free use and passage thereof without first obtaining a permit from the city." The law is to be "strictly enforced to cause the arrest of any persons violating the same." § 12.44.060. Violators must pay a fine of up to $50.00 plus the costs of prosecution and defaulting on payment can result in up to 30 days in jail. § 12.44.050.

**3.      The City's Attempt to Accommodate Evictees from River Camp**

On May 6, 2019, the Court held a hearing on Plaintiffs' original Motion for Temporary Restraining Order. *See* Dkt. #37. At the hearing, the Court stayed enforcement of the Eviction Ordinance so that the parties could determine suitable locations in Aberdeen for the former residents of River Camp to go. *See id.* Those negotiations did not yield an outcome that was acceptable to Plaintiffs, causing them to renew their Motion for Temporary Restraining Order. Dkt #43. However, the City asserts that the negotiation process caused them to re-examine their ordinances and identify places where camping would be permitted.

The City's proposal for re-locating the River Camp evictees largely amounts to a re-interpretation of its ordinances. First, the City asserts that the term "expressly reserved for pedestrian access" in § 12.46.045 of the Anti-Camping Ordinance refers to the four-foot public access route that the Americans with Disabilities Act (ADA) requires for all sidewalks. Dkt. #46 at 7. Consequently, "when there is no available overnight shelter" homeless individuals can camp on the portions of sidewalks outside the four-foot public access route without being cited under for violating the Anti-Camping Ordinance. *See* AMC § 12.46.045. The City further acknowledges that there is currently insufficient shelter for Aberdeen's homeless at all times, meaning the exception is constantly in effect. Dkt. #46 at 9. In somewhat indirect terms, the City also suggests that the Sidewalk Law and Sit-Lie Ordinance do not apply outside the ADA-required four-foot public access route or are not enforced as long as there is insufficient shelter. *Id*. at 8-9.

Under this interpretation of its ordinances, the City claims to have identified 174,500 square feet of space for camping on sidewalks inside the "enforcement zone" for the Sit-Lie Ordinance and 40,000 square feet outside it. *Id*. at 8. This area is all on relatively flat portions of sidewalk that are at least two feet in width. *Id*. Accounting for the roughly 120 square feet it takes to house a tent and the 108 individual tent sites needed, this area supposedly amounts to "between three and thirteen times" the area needed to establish alternative camping for Plaintiffs. *Id*. at 7-8. This area is also within downtown Aberdeen and close to social services such as the food bank, the department of social and health services, and other non-profits. Dkt. #46 at 6-7.

**DISCUSSION**

The purpose of a TRO is "preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing [on the preliminary injunction application], and no

longer." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423 (1974); *see also Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1130–31 (9th Cir. 2006). For a court to grant a preliminary injunction, the plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The last two factors merge if the government is a party. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). When considering whether to grant this "extraordinary remedy, . . . courts must balance the competing claims of injury and consider the effect of granting or withholding the requested relief, paying particular regard to the public consequences." *Winter*, 555 U.S. at 24.

The Ninth Circuit continues to apply one manifestation of the "sliding scale" approach to injunctions in which "a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). "In other words, 'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id*. at 1131-32. However, an injunction cannot issue even when there is a strong likelihood of success on the merits if there is just a mere possibility of irreparable harm. *Id*. at 1131 (explaining the holding in *Winter*, 555 U.S. at 22).

**1.       Likelihood of Success on the Merits**

*a.       Cruel and Unusual Punishment*

The Eighth Amendment "circumscribes the criminal process in three ways: First, it limits the kinds of punishment that can be imposed on those convicted of crimes; second, it proscribes

punishment grossly disproportionate to the severity of the crime; and third, it imposes substantive limits on what can be made criminal and punished as such." *Ingraham v. Wright*, 430 U.S. 651, 667 (1977). The last limitation should be "applied sparingly." *Id*. Nonetheless, in *Martin v. City of Boise*, the Ninth Circuit held that "the Eighth Amendment prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter" within a jurisdiction. 902 F.3d 1031, 1048 (9th Cir. 2018), *opinion amended and superseded on denial of reh'g*, 920 F.3d 584 (9th Cir. 2019). The court accordingly ordered the district court to reconsider the constitutionality of two Boise ordinances criminalizing unauthorized camping and occupation at basically all public and private locations. *Id*. at 1035, 1049. However, the court also emphasized that its ruling was narrow and did not dictate that cities "must provide sufficient shelter for the homeless, or allow anyone who wishes to sit, lie, or sleep on the streets . . . at any time and at any place." *Id*. at 1048.

In keeping with *Martin*'s self-proclaimed restraint, courts have been reluctant to stretch the ruling beyond its context of total homelessness criminalization. *Miralle v. City of Oakland*, for example, held that Oakland could clear out a specific homeless encampment because "*Martin* does not establish a constitutional right to occupy public property indefinitely at Plaintiffs' option." 2018 WL 6199929, at *2 (N.D. Cal. Nov. 28, 2018); *see also Le Van Hung v. Schaaf*, No. 19-CV-01436-CRB, 2019 WL 1779584, at *5 (N.D. Cal. Apr. 23, 2019) (reaching the same conclusion). *Quintero v. City of Santa Cruz* likewise distinguished *Martin* on the basis that the defendant city had suspended enforcement of its anti-camping ordinances and offered "adequate alternative shelter to every resident of the Encampment." No. 5:19-CV-01898-EJD, 2019 WL 1924990, at *2-3 (N.D. Cal. Apr. 30, 2019).

Courts have also limited *Martin* to situations involving criminal sanctions. In *Butcher v. City of Marysville*, in which the defendant city had evicted homeless occupants and destroyed their property, the court rejected the plaintiffs' Cruel and Unusual Punishment claim because the Eighth Amendment does not extend beyond the criminal process. No. 218CV02765JAMCKD, 2019 WL 918203, at *1-2, 7 (E.D. Cal. Feb. 25, 2019); *see also Shipp v. Schaaf*, 379 F. Supp. 3d 1033 (N.D. Cal. 2019) (holding that *Martin* did not apply because the city's temporary eviction of homeless residents from an encampment was not backed by criminal sanctions). These cases are consistent with Supreme Court precedent limiting the Cruel and Unusual Punishment Clause to "punishment imposed for the violation of criminal statutes." *See Ingraham*, 430 U.S. 667-69 (collecting cases and holding that paddling schoolchildren was beyond the scope of Eighth Amendment protections); *but see Austin v. United States*, 509 U.S. 602, 609-10 (1993) (holding that the Eighth Amendment is concerned with both civil and criminal "punishment").

With respect to the Eviction Ordinance, Plaintiffs are unlikely to succeed in their Eighth Amendment claim. *Martin* does not limit the City's ability to evict homeless individuals from particular public places—including River Camp. Therefore, even if the remaining ordinances affecting the homeless violate the Eighth Amendment, this would not compel the conclusion that the Eviction Ordinance does as well.

With respect to the City's other ordinances, Plaintiffs have raised enough questions to support a brief stay of enforcement until the Court can assess the City's regime more thoroughly. This is justified on several bases. First, additional argument and briefing is required to determine whether the *Martin*'s rationale concerning criminal sanctions extends to the civil penalties imposed by the Anti-Camping Ordinance. Although *Ingraham* held that the Cruel and Unusual Punishment Clause is limited to the criminal process, the Court held in *Austin* that the Eighth

Amendment "cuts across the division between the civil and the criminal law." 509 U.S. 602, 609-10 (1993); *but see John Corp. v. City of Houston*, 214 F.3d 573, 580 (5th Cir. 2000) (holding that *Austin* did not overrule *Ingraham*'s limitations on the Cruel and Unusual Punishment Clause). This broad conclusion sits uncomfortably with *Ingraham* and the City has provided little argument on this issue. The Court is therefore unwilling to hold definitively that *Martin*'s rationale cannot extend to the sweeping Anti-Camping Ordinance here.[1]

Second, the factual record is insufficient to determine how the ordinances restricting camping will actually apply to Plaintiffs. While the City has tried to explain that the ordinances provide ample space for Plaintiffs to camp on certain parts of the sidewalk, the Court is not yet convinced by the City's plan. The City's interpretation of its ordinances seems unmoored from their actual language in several respects. The map submitted by the City is also not very helpful for assessing whether River Camp's population can be accommodated by the spaces the City identified. These issues will be easier to resolve once Plaintiffs have actually left River Camp and relocated to other parts of Aberdeen.

b. *Right to Travel*

"The right of interstate travel has repeatedly been recognized as a basic constitutional freedom." *Mem'l Hosp. v. Maricopa Cty.*, 415 U.S. 250, 253-54 (1974). Although the Supreme Court has been cagey about explaining the origins of the right, the line of cases that Plaintiffs rely on derive it largely from the Equal Protection Clause. *See id.* at 251; *Dunn v. Blumstein*, 405 U.S. 330, (1972); *Shapiro v. Thompson*, 394 U.S. 618, 634 (1969); *see also Zobel v. Williams*,

---

[1] Plaintiffs also suggest that imposing civil penalties for camping on public property violates due process by imposing a punitive sanction outside the criminal system. They rely on *Kennedy v. Mendoza-Martinez*, which held that a civil statute that stripped citizenship from those who leave the country to avoid military service was unconstitutional. 372 U.S. 144, 166 (1963). However, Plaintiffs do not identify any cases applying this theory to ordinances affecting the homeless or explain how the small fines imposed by the Anti-Camping Ordinance are comparable to revoking citizenship.

457 U.S. 55, 61 n. 6 (1982) ("In reality, right to travel analysis refers to little more than a particular application of equal protection analysis . . . [to] state distinctions between newcomers and longer term residents."). "Thus, . . . a classification which 'operates to Penalize those persons . . . who have exercised their constitutional right of interstate migration' must be justified by a compelling state interest." *Id*. at 258 (quoting *Oregon v. Mitchell*, 400 U.S. 112, 238 (1970)). In *Shapiro*, for example, the Court held that a one-year waiting requirement to obtain welfare benefits penalized travel because it denied new residents the means to obtain "food, shelter, and other necessities of life." 394 U.S. at 627, 634.

Although some circuits have held that intrastate travel is also protected by the Constitution, *see, e.g., King v. New Rochelle Municipal Housing Auth.*, 442 F.2d 646, 648 (2d Cir. 1971), the Supreme Court and the Ninth Circuit have declined to weigh in. *Mem'l Hosp.*, 415 U.S. at 255-56; *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 944 n. 7 (9th Cir. 1997). However, the Washington Supreme Court has held that the right to intrastate travel is protected by both the U.S. and Washington State Constitutions. *Eggert v. City of Seattle*, 81 Wash. 2d 840, 845 (1973) (reasoning that the right to travel in the U.S. Constitutional applies within states); *Macias v. Dep't of Labor & Indus. of State of Wash.*, 100 Wash. 2d 263, 275 (1983) (holding without further explanation that the Washington Constitution's privileges and immunities clause supports a right to travel based on equal protection of the law).

In *Pottinger v. City of Miami*, the Southern District of Florida applied the right to travel to enjoin city ordinances that criminalized conduct essential to life as a homeless person. 810 F.Supp. 1551, 1580 (S.D.Fla.1992). The plaintiffs sued after Miami's homeless population was arrested and harassed over the course of several years for standing, sleeping, or sitting on sidewalks and in parks. *Id*. at 1559-60. The court held that "[p]reventing homeless individuals

from performing activities that are 'necessities of life,' such as sleeping, in any public place when they have nowhere else to go effectively penalizes migration." *Id*. at 1580; *see also City of Seattle v. McConahy*, 86 Wash. App. 557, 571 (1997) (adopting *Pottinger*'s reasoning but declining to invalidate a Seattle ordinance prohibiting sitting and lying on sidewalks).

Some courts in this circuit have recognized *Pottinger*'s holding on the right to travel, *see, e.g., Veterans for Peace Greater Seattle, Chapter 92 v. City of Seattle*, No. C09-1032 RSM, 2009 WL 2243796, at *4 (W.D. Wash. July 24, 2009), but more have questioned or rejected its foundation. *See, e.g., Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1111 (E.D. Cal. 2012); *Joyce v. City & Cty. of San Francisco*, 846 F. Supp. 843, 861 (N.D. Cal. 1994). None, however, have followed *Pottinger*'s logic to enjoin an ordinance prohibiting camping or other conduct that homeless people often engage in. *See Nishi v. Cty. of Marin*, No. C11-0438 PJH, 2012 WL 566408, at *5 (N.D. Cal. Feb. 21, 2012) (ordinance prohibited overnight camping); *Roulette v. City of Seattle*, 850 F. Supp. 1442, 1448 (W.D. Wash. 1994), *aff'd*, 78 F.3d 1425 (9th Cir. 1996) (ordinance restricted sitting and lying on sidewalks during daytime hours). Federal courts have also declined to apply *Pottinger* when a city seeks to evict homeless plaintiffs from a particular location. *See Veterans for Peace*, 2009 WL 2243796, at *5 (WSDOT sought to evict homeless plaintiffs from its property); *Davison v. City of Tucson*, 924 F. Supp. 989, 993 (D. Ariz. 1996) (city sought to evict homeless plaintiffs from long-standing encampment).

Finally, Plaintiffs also cite a line of Washington cases addressing banishment orders. In *State v. Schimelpfenig*, for example, the Washington Court of Appeals held that a criminal sentence banishing a defendant from Grays Harbor for life violated the right to intrastate travel and was therefore subject to strict scrutiny. 128 Wash. App. 224, 226 (2005). Applying a fact-

intensive analysis, the court determined that the restriction was too broad and not justified by any imminent threat posed by the defendant. *Id*. at 229-30.

With this legal backdrop, Plaintiffs' claim that the Eviction Ordinance violates their right to travel is unlikely to succeed. Courts in this circuit agree that the right to travel is not a right to remain indefinitely wherever one pleases. While it may be that the City could have pursued more lenient options that allowed Plaintiffs to remain at River Camp under different conditions, they were not constitutionally required to do so.

However, similar to the Eighth Amendment claim, Plaintiffs have managed to raise enough questions to justify temporarily staying enforcement of the City's other ordinances. Although the Court is skeptical that the equal protection analysis applied in cases like *Shapiro* is applicable to ordinances that affect new and old residents equally, there is some inherent force to the argument that a City cannot effectively cast out its homeless population. The problem for Plaintiffs, however, is that the only ordinance affecting all public property, the Anti-Camping Ordinance, only imposes a small fine for violations and does not threaten criminal sanctions. This is a far cry from *Pottinger*'s systematic campaign against the homeless or *Schimelpfenig*'s banishment order backed up by criminal sanctions. Under Washington law, failure to pay a civil fine cannot result in criminal contempt if the defendant is homeless, so the Anti-Camping Ordinance does not appear to have much bite. *See* RCW 10.01.180(3)(c). It is possible that enforcement will involve efforts to remove the homeless from places they are not allowed to camp, but that is not written into the law itself. Nonetheless, because the City's ordinances do encompass all public property and it remains unclear where River Camp's evictees will relocate, the Court is presently unwilling to hold that Plaintiffs' right to travel claim is destined to fail.

*c.     Freedom of Association*

The right to associate freely breaks down into two separate forms of association. "In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18 (1984). "In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Id*. at 618. This associational right only applies if the group engages in "expressive association." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).

Here, Plaintiffs' freedom of association claim is unlikely to succeed. It is unclear what expressive activity Plaintiffs engage in that is contingent on being able to camp on public property without any legal repercussions. The City's ordinances also do not directly regulate how the homeless congregate as family units. Unlike *Moore v. City of East Cleveland, Ohio*, where the ordinance determined the types of relatives that could live together, the ordinances in this case have no such goal. 431 U.S. 494, 498-99 (1977). Indeed, even if the City's ordinances amounted to banishment, they still would not prohibit Plaintiffs from cohabiting with relatives in Aberdeen who wanted to live together. Plaintiffs identify no cases where freedom of association was applied to enjoin an ordinance affecting the homeless and the Court is unpersuaded by Plaintiffs' novel arguments.

**2.     Irreparable Harm**

Because Plaintiffs fail to establish either likelihood of success on the merits or serious questions regarding the Eviction Ordinance's constitutionality, the closure of River Camp does

not present the possibility of irreparable constitutional violations. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976). Furthermore, enjoining the Eviction Ordinance is not necessary to prevent Plaintiffs from being forced out of Aberdeen; temporarily enjoining enforcement of the City's other ordinances will ensure they are not immediately required to leave. Many of the Plaintiffs will certainly be sad to depart the place they have called home for years, but this effect of the City's decision does not rise to the level of irreparable harm.

However, Plaintiffs face a sufficient likelihood of irreparable harm to justify temporarily enjoining enforcement of the remaining ordinances. On their face, these ordinances make camping either civilly or criminally sanctionable on all public property and are strictly enforced. Although the City has stated that it will not enforce the ordinances on certain areas of the sidewalk, these assurances clash with the laws' sweeping language. It therefore seems likely that at least some former residents of River Camp will simply leave Aberdeen to go someplace where public camping does not carry the inherent risk of criminal or civil liability. For people who have lived in Aberdeen for years and have little money to relocate frequently, this harm is sufficiently irreparable.

3.  **Balance of Equities and Public Interest**

With respect to the Eviction Ordinance, the balance of equities and public interest do not favor an injunction. It is true that some Plaintiffs stand to lose the place they call home. However, the City has persuasively shown that River Camp poses dangers for those who live there and for the City's police and first responders. The camp's isolation makes it particularly ripe for criminal activity and life-threatening accidents. At the same time, the camp's hazardous terrain makes it difficult for the City to access the property to stop dangerous conduct and protect

lives. It would therefore not be in the public interest to prevent the City from closing River Camp.

The equities balance differently when it comes to the City's other ordinances. The City has already admitted that it lacks sufficient shelter to house its homeless population and will therefore refrain from arresting or citing homeless people who camp outside the 4-foot thoroughfare on public sidewalks. A temporary injunction therefore would not put a much larger burden on the City than that which it has already taken up willingly. On the other hand, the ordinances will likely saddle Plaintiffs with legal liability if they stay in Aberdeen or incite them to leave altogether. Strict enforcement of the ordinances restricting camping is therefore not in the public interest and the equities favor Plaintiffs.

## CONCLUSION

For the above reasons, Plaintiffs' Motion is DENIED with respect to the Eviction Ordinance, or Ordinance No. 19-5. Plaintiffs' Motion is GRANTED with respect to the Anti-Camping Ordinance, AMA § 12.46. The Motion is also partly GRANTED with respect to the Sidewalk Law, AMA § 12.44, and Sit-Lie Ordinance, AMA § 12.41, which are enjoined only regarding those portions sidewalk space outside of the four-foot public access route and other areas identified by the City as necessary for ADA compliance.

//

//

//

//

//

Although the Court remains skeptical of Plaintiffs' arguments, they at least warrant a full hearing that would be better held on a later date after Plaintiffs have relocated from River Camp. The Court will tentatively schedule that hearing for September 4, 2019, at 9:30 A.M.

IT IS SO ORDERED.

Dated this 2nd day of July, 2019.

Ronald B. Leighton
United States District Judge